[No. S007766. Feb. 27, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMMY MARSHALL, Defendant and Appellant.

## COUNSEL

Kenneth W. Oder and John J. Lyons, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General,

Donald E. deNicola, Susan L. Frierson, John R. Gorey and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT.**—In this death penalty case, a jury convicted defendant Sammy Marshall of one count of first degree murder (Pen. Code, § 187; all statutory references are to the Penal Code unless otherwise indicated), two counts of robbery (§ 211), two counts of attempted forcible rape (§§ 664, 261, subd. (a)(2)), and one count of kidnapping (§ 207). The jury found to be true special circumstance allegations that the murder was committed during the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)) and rape (§ 190.2, subd. (a)(17)(C)). Defendant was sentenced to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

We affirm defendant's convictions for first degree murder, one count of robbery, two counts of attempted forcible rape, and kidnapping. We reverse the conviction for one count of robbery, set aside the special circumstance findings, and reverse the judgment of death.

### I. GUILT PHASE FACTS

Defendant's convictions are based on crimes committed against two women, Durneall H. (one count each of robbery, attempted rape, and kidnapping) and Sharon Rawls (one count each of robbery, attempted rape, and murder).

#### A. Prosecution Evidence

##### 1. Crimes against Durneall H.

On March 15, 1986, at approximately 3 a.m., Durneall H. was walking in the vicinity of 81st Street and Central Avenue in Los Angeles. Defendant approached her and asked if she wanted to "get high." She told him, "No, I don't get high," and started to walk away. Defendant then grabbed her by the neck, choked her, and beat her head against a wall as he dragged her through an alley towards an abandoned apartment building at 1118 East 80th Street. Defendant told H. that he was going to rape and kill her.

As H. struggled to break free, a bus pass bearing her picture fell out of her pocket. Defendant picked up the bus pass and put it in his pocket. When H.

saw someone come to the window of a nearby apartment, she screamed for help, and defendant fled.

### 2. *Crimes against Sharon Rawls*

On April 13, 1986, at approximately 5:15 a.m., Hattie Foster was awakened by the sounds of a woman screaming "please, please stop." Hattie woke up her husband, John, who got up and opened a window. John determined that the screams were coming from an abandoned apartment building at 1118 East 80th Street, behind the Fosters' home. Grabbing a three-foot-long machete, John went outside and approached the abandoned apartment building. A man, whom John had never seen before, came out of the front entrance with shoes in his hand. When confronted by John, standing tall at six feet four inches and weighing two hundred seventy-two pounds, the man looked nervous. He denied being with a woman in the building, and walked away. (No one ever located or identified this man.) John then saw defendant looking at him from a window in the abandoned building.

Apparently in response to a telephone call from Hattie Foster, Los Angeles Police Officers Joseph Avila and Charlotte Smith arrived at the scene at 6 a.m. John Foster was still in front of the abandoned building. Defendant came out of the building, pushing a bicycle. The officers stopped him and conducted a patdown search. Upon retrieving a knife, the officers handcuffed defendant and ordered him to kneel. Defendant denied any wrongdoing. He said that he had been with his girlfriend in the building and that there was another man in the building. Defendant then reached into his right front pants pocket, pulled out a piece of paper, and dropped it to the ground. When Officer Avila picked up the piece of paper and put it in defendant's left front pocket, defendant said, "This is not mine." The item was later determined to be a letter from Superior Warehouse Grocers responding to a request from Sharon Rawls for a check-cashing card. The handwriting of Sharon Rawls and her sister was on the back of the letter, which also bore Sharon Rawls's fingerprint.

When Sheriff's Deputy Nathanson arrived at the scene, he took custody of defendant. The deputy noticed a bloodstain on defendant's sweatshirt, an injury on his right hand, and fresh abrasions on his right elbow. No money or other property belonging to Rawls was found on defendant when he was booked at the jail.

Another deputy, William Gleason, found the body of 27-year-old Sharon Rawls, a prostitute, on the floor of a bathroom in the abandoned building. Her pants and underpants were pulled down around the lower parts of her

legs, and a wad of cloth was stuffed in her mouth. There were a number of abrasions on her face, on the back of her neck, on her elbows, on her fingers, and inside her mouth. No money was found on Rawls's person.

The next day, April 14, 1986, the police searched defendant's room at 1160 East 80th Street and found victim Durneall H.'s bus pass.

The autopsy of Sharon Rawls was performed by Deputy Medical Examiner Susan Selser. Dr. Selser did not testify at defendant's trial, where the medical evidence was presented by her supervisor, Dr. Lakshmanan Sathyavagiswaran, an expert in forensic pathology and the Chief of Forensic Medicine of the Los Angeles County Medical Examiner's Office. Based on his experience, a review of Dr. Selser's report, and photographs, Dr. Sathyavagiswaran attributed Rawls's death to "asphyxia due to compression of her neck and also obstruction of her airway."

Douglas Ridolfi, a senior criminalist with the Los Angeles County Sheriff's Department, testified that a large amount of semen was found both in Rawls's vagina and on her panties, and that some of the semen came from someone who was a blood type A secretor. Defendant is a type O nonsecretor, as was murder victim Rawls.[1] In Rawls's vagina, Ridolfi discovered a "foreign enzyme" that could not have lasted very long within a vaginal sample. He attributed the enzyme to intercourse occurring shortly before Rawls's death. Ridolfi stated that "based on [defendant's] enzyme markers, I felt that he could be included as a possible donor of more recently deposited semen." The bloodstain on defendant's sweatshirt was consistent with Rawls's blood type, which is shared by approximately 6 percent of the general population in Los Angeles County.

B. *Defense Evidence*

The defense presented no evidence at the guilt phase of the trial.

## II. Penalty Phase Facts

A. *Prosecution Evidence*

At the penalty phase of defendant's trial, Bettina Weinstein testified that in August 1977 defendant followed her home from a bar. When she refused his sexual advances, he hit her with his fist and started to strangle her. She managed to escape, and ran towards her apartment, followed by defendant.

[1]Unlike the blood type of a secretor, the blood type of a nonsecretor cannot be determined from that person's bodily fluids.

When Weinstein's friend appeared at the door of Weinstein's apartment, defendant left.

Defendant stipulated to these prior convictions: rape by threat or force of Patricia T. in 1975; assault with force likely to inflict great bodily injury on Bettina Weinstein in 1978; and false imprisonment by violence, menace, fraud or deceit of Maria Fabela in 1981.

### B. *Defense Evidence*

Los Angeles County Deputy Sheriff Thomas Halstead stated that during the trial defendant was kept in a high security area in the county jail; that his cell measured six feet by eight feet; that he was confined to the cell twenty-three and a half hours a day (except for court appearances); and that he was allowed out of the cell for one-half hour a day to walk in the hallway, talk to other inmates, and use a pay phone. On cross-examination, Deputy Halstead said that after the trial defendant would be moved to the state prison where, Deputy Halstead had been told, conditions of confinement "are much nicer."

Richard Marshall, defendant's father, testified that defendant, who was 42 years old at the time of trial, had in his younger days been a good student who, while attending school, worked in a grocery store to help support his family. Defendant's father expressed his love for defendant, as did Mary Starks, defendant's aunt.

Farrell and Antoinette Banks, close friends of defendant, told of their high regard for defendant, who would often take their children to the beach and to parks. Another friend, Irene Ball, stated that defendant was living with her and her family at the time of his arrest, and that in previous years defendant would come to her home and take her children hiking. She did not believe that defendant had killed Sharon Rawls. Anna Ball, Irene Ball's daughter, testified that she "basically" agreed with her mother's testimony.

### III. PRETRIAL ISSUES

### A. *Defendant's Representation*

#### 1. *Facts*

More than two years elapsed between defendant's arraignment in superior court in this matter and the commencement of trial. The pretrial proceedings were prolonged in part because of defendant's ambivalence about and

dissatisfaction with his various counsel. Even when he secured pro se status, he made repeated motions for advisory or second counsel, and these motions required repeated continuance of trial. The record discloses evidence of manipulation on defendant's part, as well as a certain antipathy to commencing trial. Some account of the pretrial proceedings is necessary.

Defendant was represented by a public defender at the beginning of the proceedings. Commissioner Cowell, sitting as a judge pro tempore by stipulation (hereafter Judge Cowell), presided at defendant's arraignment and at various pretrial hearings. At his first appearance after arraignment, on July 15, 1986, defendant declared that "I need another counsel." When the court explained the limited grounds for removal of appointed counsel, defendant raised the possibility of removing counsel by moving to relieve counsel pursuant to *People* v. *Marsden* (1970) 2 Cal.3d 118, 124 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*) or by making a *Faretta* motion (*Faretta* v. *California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562]). The court examined defendant regarding his dissatisfaction with counsel and denied the *Marsden* motion. The court then engaged defendant in an extensive colloquy regarding the many risks and dangers of self-representation. After a discussion that spreads over 20 pages of transcript, defendant withdrew his motion to proceed pro se. The motion and defendant's withdrawal of the motion are reflected in the clerk's minutes as well as in the reporter's transcript.

After several more pretrial hearings, including a motion to set aside the information pursuant to section 995 and four defense motions for continuance for further investigation, on December 19, 1986, defendant again moved to represent himself. Judge Cowell again advised him exhaustively of the risks involved, but on this occasion defendant decided to proceed pro se. The court honored his request, and granted his motion for continuance until February 20, 1987. Again, the nature of the motion and the ruling thereon appear in both the reporter's transcript and the clerk's minutes.

At a January 26, 1987, hearing, the defendant moved for the appointment of one Ray Newman as advisory counsel, arguing that "[s]ince it is a death penalty case, I should be entitled to my—a counsel of my choice." The court agreed to ask the attorney named by defendant whether he might be available. The court was unable to locate the attorney and thereafter denied the motion for advisory counsel. Defendant made a motion for second counsel under authority of *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108], which the court denied.

At a hearing held on February 2 and 3, 1987, defendant renewed his motion for the appointment of Mr. Newman as cocounsel, whom he described as the only attorney he could get along with. Defendant explained

that since it was a capital case, he needed assistance from someone with experience, "[b]ecause I can't handle this alone, by myself. [¶] I mean, that's my right, to have a co-counsel." Later, he explained: "I need a co-counsel because I need somebody to speak for me in general, in law, layman terms." When the court was not inclined to appoint Mr. Newman, defendant asked if he could give up his pro se status and have Newman appointed as his attorney. The court responded that if he gave up his pro se status, the public defender would be appointed. The court denied defendant's renewed motions for cocounsel or advisory counsel, expressing concern that defendant was attempting to manipulate the court by seeking self-representation in order to secure the dismissal of the public defender's office, and then giving up pro se status in order to have a certain attorney appointed. The court granted defendant's motion for continuance until March 25, 1987.

On February 12, 1987, defendant renewed his motion for second counsel, stating that "I thought it wouldn't be no problem, you know, me having an assistant attorney, or something." The court observed that defendant had made no showing that the complexity of the case indicated that one attorney would not suffice and suggested that the problem was defendant's decision to proceed pro se. The court stated: "Again, I reiterate, so the record is quite clear, what you are telling me here in this motion, and in your words, basically, is that you personally can't handle this, and you want an attorney. [¶] Well, an attorney is not the same as additional counsel. [¶] If you want the court to regard this as a motion to appoint counsel, I will do so, but I'm not going to appoint second counsel on the basis of the showing made before the court. [¶] Now, do you wish to have counsel appointed, in which case the court will reappoint the public defender's office?" Defendant suggested the public defender's office would have a conflict, and he retained his pro se status.

On February 27, 1987, defendant challenged the court for cause pursuant to Code of Civil Procedure section 170.1, in part because, he alleged, Judge Cowell had "unjustly threatened to deny defendant his choice of counsel by reason of unfounded accusations." At the hearing on the challenge for cause held before another judge, Judge Cowell explained again that he feared defendant was using his pro se status to secure the dismissal of the public defender and the appointment of a particular counsel. The court denied the challenge for cause.

When the matter returned to Judge Cowell on March 27, 1987, defendant reiterated his request for advisory counsel or second counsel, suggested the case could not go forward without such assistance, and asked for a further seven-month continuance in order to secure a ruling from the Court of

Appeal on his challenge to Judge Cowell's ruling on defendant's request for advisory counsel. The court granted a continuance to May 26, 1987.

On May 13, 1987, five months after he had been granted the right to proceed pro se, defendant sought to relinquish his pro se status, declaring, "I realize now that I can't accept my status as pro per in my case." When the court referred him to the public defender's office, defendant advised the court of what defendant urged was a likely conflict of interest arising from defendant's civil lawsuit against the public defender's office. Thereafter the public defender's office declared a conflict, and a private attorney, Ira Kaufman, was appointed.

Kaufman successfully moved for a continuance on six occasions. On the last occasion, the court cautioned counsel that the matter was calendared for trial setting on December 14, 1987, and that it expected a firm trial date to be selected at that time because the case was so old. The record discloses that defendant's interchanges with the court and his written filings as a pro se litigant were coherent until December 17, 1987, when defendant made a bizarre, rambling statement to the court, and the matter was continued to January 8, 1988, for trial setting. On that date, defense counsel asked that the matter trail because of concerns over defendant's competency. On January 13, 1988, pursuant to section 1368, defense counsel moved for a hearing as to competency.

On February 10, 1988, the matter was transferred to Judge Kalustian's department for "all purposes." After a competency hearing was held before Judge Kalustian, the court found defendant competent.

At the next hearing before Judge Kalustian, on February 23, 1988, defense counsel Kaufman announced he would be ready for trial the week of March 28, 1988, and with the prosecutor's concurrence the court set trial to commence at that time. Defense counsel then made an ex parte motion for an order that defendant provide blood, saliva, hair, and fingernail samples. Counsel explained that defendant had refused repeatedly to provide such samples. Counsel requested an order from the court to secure the samples, stating that "upon being told this, Mr. Marshall says I am not helping him and he would like to go in pro per at this point. [¶] Is that correct Mr. Marshall?"

The following colloquy ensued. Defendant asked: "Could I say something, your honor?" The court responded: "No, let me do the talking. [¶] To start with, your request for an order ordering Mr. Marshall to submit to withdrawal of blood and saliva sample, a fingernail sample and hair sample, the

court orders him to do that. You are ordered to give those samples, Mr. Marshall." Defendant asked: "Could I say something, your honor?" The court responded: "Not on that subject." The defendant then stated: " I would like to fire this attorney and go pro per because this is not—my right is being violated in this courtroom department P right now. [¶] And the court orders, after I done told him just a few minutes ago that I would like to go pro per before you made that order, now I really don't know what to say because I am thinking I am being a victim used by this court, the Norwalk court where I should be downtown, LA or either in Compton. I don't know how this case got out here in Norwalk court from downtown. [¶] And maybe I should have maybe a few more minutes then just to think, and then I can come back and really tell you what my mind, the back of my head is telling me to tell you because all this stuff, it happened so fast, I am fighting a capital case. And this man have been trying to get me to do things. But I am on trial for my life as against other things and measures that have happened in the past dealing with people inside this court. [¶] I don't care to mention names right now, but other people is watching over this case, this magnitude of case. Lot of things done happened in this court, Norwalk courts over the past. The Legislature want this court closed. Take that for whatever it's worth. That's a saying I got in the county jail. This lawyer know it. I had some dealing with his family, other people in this court. [¶] Like I said, if you give me time to come back and talk to you in a few minutes, if you want to know the circumstances behind all this stuff, I will let you know in a way round about."

The court responded: "Now is the time, Mr. Marshall, to let me know."

Defendant said: "Now you asking me right now to explain to you the circumstances behind all this?"

The court responded: "No. I am asking you to tell me why you want me to fire your lawyer and allow you to go in pro per."

Defendant replied: "If you give me another lawyer, it still won't do me no good on this capital case because I believe I am being used by this court in order to keep this court open for future. [¶] But let me say this, then I will be finished. I will take the pro per status. I will die in the county jail because I am not given anything contradict to my death, and that's my final words, and that just the honest truth. [¶] I don't believe in any god or nothing like that. If it is my time to die, I will die here or the county jail because I am not going to do that. If you do that, my rights is being violated because this is my attorney. [¶] The court don't have no right in saying so court order to tell my attorney or give my attorney reference which will be returning to deputy,

I mean district attorney Bazanich right here which I had dealing in his family lifestyle, too. [¶] So if you going to fight the case, just fight my case on merit from that murder book, from the evidence they got. If he any kind of attorney, he should have stayed in medical school to get by license and practicing law, and that's the truth. [¶] I got that on everybody in here from this lady here, this lady here, this man here, this gentleman here, I used to work with and he not in here today. But I am going to just leave it alone. Let me decide. [¶] Like I said, other people watching over this case and it is not a joke. Life is for real and you know it from the place you came from, where you came from back south or whatever, but you do what you want to do because it's your court."

The court responded: "Thank you, Mr. Marshall. [¶] Request to relieve Mr. Kaufman is denied. And your request to proceed in pro per is denied. [¶] The pretrial and trial, the pretrial motion dates and the trial date will stand."

On the day set for trial, defendant was not present, and the matter was continued to the next day. The following day, the bailiff reported that on the trial date defendant had "flipped out" in the county jail. At defense counsel's request, the court ordered another competency hearing under section 1368. The jury heard unanimous expert testimony that defendant was incompetent, with the experts expressing cautious reservations on the ground that defendant might be faking his symptoms. Lay witnesses reported instances of defendant's normal behavior. The jury determined that defendant was competent to stand trial, a verdict lending some support for the view that defendant was faking his psychiatric symptoms.

On May 11, 1988, at the conclusion of the competency trial, defendant's attorney, Kaufman, withdrew on the ground he had been appointed to a public defender post in another county. Kaufman had secured the appointment of cocounsel, Ron Slick, and at this hearing Slick was appointed to represent defendant as sole counsel. Defendant declared that he understood the action taken by the trial court. Trial was continued until September 7, 1988.

On that date, when trial commenced in Judge Kalustian's department, defendant again voiced dissatisfaction with counsel, this time asking for substitution of counsel. He declared: "You can go on with the trial, but I don't want him as the lawyer. I'd like to have me another attorney appointed. See can I call some attorney, maybe Reese or something about that because I got about two billion dollars in the bank. I want to see can I hire Sammy Weiss or somebody going to go pay more close attention to this case." The court denied the motion, and trial proceeded, apparently without further motions related to defendant's representation by counsel.

## 2. *Self-representation*

■ A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive. A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution. (*United States* v. *Wade* (1967) 388 U.S. 218, 223-227 [87 S.Ct. 1926, 1930-1932, 18 L.Ed.2d 1149]; *Gideon* v. *Wainwright* (1963) 372 U.S. 335, 339-345 [83 S.Ct. 792, 793-797, 9 L.Ed.2d 799, 93 A.L.R.2d 733]; *Powell* v. *Alabama* (1932) 287 U.S. 45, 71 [53 S.Ct. 55, 65,77 L.Ed. 158, 84 A.L.R. 527].) At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself. (*Faretta* v. *California, supra*, 422 U.S. 806, 819 [95 S.Ct. 2525, 2533] (*Faretta*).)

The United States Supreme Court has concluded in numerous cases and a variety of contexts that the federal Constitution requires assiduous protection of the right to counsel. ■ The right to counsel is self-executing; the defendant need make no request for counsel in order to be entitled to legal representation. (*Carnley* v. *Cochran* (1962) 369 U.S. 506, 513 [82 S.Ct. 884, 888-889, 8 L.Ed.2d 70].) The right to counsel persists unless the defendant affirmatively waives that right. (*Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464-465 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 146 A.L.R. 357].) Courts must indulge every reasonable inference against waiver of the right to counsel. (*Brewer* v. *Williams* (1977) 430 U.S. 387, 404 [97 S.Ct. 1232, 1242, 51 L.Ed.2d 424].)

The high court has not extended the same kind of protection to the right of self-representation. In *Faretta* itself the court noted that a trial court may appoint advisory counsel for a pro se defendant even over objection (*Faretta, supra*, 422 U.S. at p. 835, fn. 46 [95 S.Ct. at p. 2541]), and advisory counsel's unsolicited intervention at trial does not necessarily violate the defendant's right to present his or her own defense. (*McKaskle* v. *Wiggins* (1984) 465 U.S. 168, 187-188 [104 S.Ct. 944, 956, 79 L.Ed.2d 122].) The high court also warned that the right of self-representation is not a license to abuse the dignity of the courtroom, but a right that can be lost through deliberate, serious misconduct. (*Faretta, supra*, 422 U.S. at p. 834, fn. 46 [95 S.Ct. at p. 2541].) Furthermore, unlike the right to be represented by counsel, the right of self-representation is not self-executing. In *Faretta, supra*, 422 U.S. 806, the court held that a knowing, voluntary, and unequivocal assertion of the right of self-representation, made weeks before trial by a competent, literate defendant, should have been recognized (*id.* at pp. 835-836 [95 S.Ct. at p. 2541]); subsequent decisions of lower courts have required

expressly that the defendant make a timely and unequivocal assertion of the right of self-representation. (See *People* v. *Windham* (1977) 19 Cal.3d 121, 127-128 [137 Cal.Rptr. 8, 560 P.2d 1187]; *Hamilton* v. *Groose* (8th Cir. 1994) 28 F.3d 859, 861; *U.S.* v. *Treff* (10th Cir. 1991) 924 F.2d 975, 978-979; *United States* v. *Smith* (9th Cir. 1986) 780 F.2d 810, 811; *United States* v. *Weisz* (D.C. Cir. 1983) 718 F.2d 413, 425-426 [231 App.D.C. 1] [court applies a "stringent standard" for judging the adequacy of the defendant's invocation because of the strong presumption against waiver of the right to counsel]; see also *Dorman* v. *Wainwright* (11th Cir. 1986) 798 F.2d 1358, 1365-1366 [noting that unlike other constitutional rights, the right of self-representation readily can be waived if the defendant fails to invoke it properly].) As one court observed: "[T]he right of self-representation is waived unless defendants articulately and unmistakably demand to proceed *pro se*." (*United States* v. *Weisz, supra,* 718 F.2d at p. 426.)

The United States Supreme Court has provided little direct guidance on the question of what a trial court should consider in determining whether the defendant unequivocally has invoked the right of self-representation. It has not spoken on the question whether the trial court may deny a timely request for self-representation if the motion is insincere, ambivalent, or unconsidered, although the high court's emphasis in *Faretta, supra,* 422 U.S. 806, on the defendant's knowing, voluntary, unequivocal, and competent invocation of the right suggests that an insincere request or one made under the cloud of emotion may be denied.

Several lower courts have declared that a motion made out of a temporary whim, or out of annoyance or frustration, is not unequivocal—even if the defendant has said he or she seeks self-representation. (*Reese* v. *Nix* (8th Cir. 1991) 942 F.2d 1276, 1281 [the defendant stated "well I don't want no counsel then," but this was deemed a mere impulsive response to the trial court's denial of a request for new counsel]; *Jackson* v. *Ylst* (9th Cir. 1990) 921 F.2d 882, 888-889; *Hodge* v. *Henderson* (S.D.N.Y. 1990) 761 F.Supp. 993, 1001-1002; *People* v. *Hacker* (1990) 167 App.Div.2d 729 [563 N.Y.S.2d 300, 301]; *Reese* v. *State* (Iowa Ct.App. 1986) 391 N.W.2d 719, 724.) As one court expressed it, a court "properly may deny a request for self-representation that is a 'momentary caprice or the result of thinking out loud.'" (*Jackson* v. *Ylst, supra,* 921 F.2d at p. 888.) In *People* v. *Hacker, supra,* 563 N.Y.S.2d 300, for example, in response to defendant's request, the trial court inquired whether the defendant was certain he wanted to proceed pro se, and he responded affirmatively. The reviewing court nonetheless found the record as a whole did not reflect an unequivocal request, but rather a spur of the moment decision prompted by the denial of defendant's motion for substitute counsel. (563 N.Y.S.2d at p. 301.) And in *Jackson*

v. *Ylst, supra,* 921 F.2d 882, 889, the defendant stated: " 'I want to fight it in pro per then. Relieve him and I do this myself.' " The reviewing court considered the record as a whole, including the defendant's failure to assert the right of self-representation at a later hearing, and independently determined that the defendant's request for self-representation was an impulsive response to the trial court's denial of his request for substitute counsel. Examining the question whether the defendant in fact wanted to represent himself, the court stated: "Jackson's emotional response when disappointed by the trial court's denial of his motion for substitute counsel did not demonstrate to a reasonable certainty that he in fact wished to represent himself." (*Ibid.,* italics omitted.)

Some courts have held that vacillation between requests for counsel and for self-representation amounts to equivocation or to waiver or forfeiture of the right of self-representation. (*Williams* v. *Bartlett* (2d Cir. 1994) 44 F.3d 95, 100-101; *Brown* v. *Wainwright* (5th Cir. 1982) 665 F.2d 607, 611; *United States* v. *Bennett* (10th Cir. 1976) 539 F.2d 45, 49-51; *Olson* v. *State* (Ind. 1990) 563 N.E.2d 565, 570; *State* v. *Lewis* (1986) 104 N.M. 677 [726 P.2d 354, 359].) And another court has advised that the defendant's conduct, as well as words, must be taken into account, stating: "Equivocation, which sometimes refers only to speech, is broader in the context of the Sixth Amendment, and takes into account conduct as well as other expressions of intent." (*Williams* v. *Bartlett, supra,* 44 F.3d at p. 100.)

Other courts have declared that a timely motion for self-representation made for the purpose of delay or to disrupt the orderly administration of justice need not be granted. (*U.S.* v. *George* (9th Cir. 1995) 56 F.3d 1078, 1084; *U.S.* v. *Flewitt* (9th Cir. 1989) 874 F.2d 669, 674.)

Many courts have explained that a rule requiring the defendant's request for self-representation to be unequivocal is necessary in order to protect the courts against clever defendants who attempt to build reversible error into the record by making an equivocal request for self-representation. Without a requirement that a request for self-representation be unequivocal, such a request could, whether granted or denied, provide a ground for reversal on appeal. This problem has irked many courts, and some of their opinions have given examples of such abuse. (*People* v. *Williams* (1990) 220 Cal.App.3d 1165, 1170 [269 Cal.Rptr. 705] [referring to the "*Faretta* game"]; *Reese* v. *Nix, supra,* 942 F.2d at p. 1280; *U.S.* v. *Treff, supra,* 924 F.2d at p. 979; *Cross* v. *U.S.* (8th Cir. 1990) 893 F.2d 1287, 1290; *Tuitt* v. *Fair* (1st Cir. 1987) 822 F.2d 166, 177 [collecting cases]; *Meeks* v. *Craven* (9th Cir. 1973) 482 F.2d 465, 467-468.)

We share the concern that some assertions of the right of self-representation may be a vehicle for manipulation and abuse. It is not only the stability

of judgments that is at stake, however, when we require a defendant to make an unequivocal request for self-representation. The defendant's constitutional right to the effective assistance of counsel also is at stake—a right that secures the protection of many other constitutional rights as well. (See *Jackson* v. *Ylst, supra,* 921 F.2d at p. 889; *Adams* v. *Carroll* (9th Cir. 1989) 875 F.2d 1441, 1444; *United States* v. *Weisz, supra,* 718 F.2d at pp. 425-426; *Hodge* v. *Henderson, supra,* 761 F.Supp. at p. 1001.) The high court has instructed that courts must draw every inference against supposing that the defendant wishes to waive the right to counsel. (*Brewer* v. *Williams, supra,* 430 U.S. at p. 404 [97 S.Ct. at p. 1242].) It follows, as several courts have concluded, that in order to protect the fundamental constitutional right to counsel, one of the trial court's tasks when confronted with a motion for self-representation is to determine whether the defendant truly desires to represent himself or herself. (*Jackson* v. *Ylst, supra,* 921 F.2d at p. 889; *Adams* v. *Carroll, supra,* at p. 1444; *Hodge* v. *Henderson, supra,* 761 F.Supp. at p. 1001 [the court must " 'determine whether a defendant genuinely means what he says' "]; *State* v. *Williams* (1993) 334 N.C. 440 [434 S.E.2d 588, 595-597], reaffirmed 339 N.C. 1 [452 S.E.2d 245, 253] following remand by United States Supreme Court on another point [refusing to find an assertion of the *Faretta* right "if the defendant's statements or actions create *any ambiguity as to his desire* to represent himself" (italics added)].) The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied.

 The United States Supreme Court has not explained what standard a reviewing court should apply to a claim that the trial court violated the defendant's rights in denying—or granting—a motion for self-representation. The defendant argues that we should review only the facts before the court ruling on the motion, and that in determining whether the motion was unequivocal, we should be bound by the trial court's apparent understanding that the defendant was making a motion for self-representation. As we explain, we reject this position.

 Some reviewing courts treat the question whether the defendant has made a knowing and voluntary assertion of the right to self-representation as a question of fact, according deference to the trial court's determination.

(*Fields* v. *Murray* (4th Cir. 1995) 49 F.3d 1024, 1032; *Cain* v. *Peters* (7th Cir. 1992) 972 F.2d 748, 749.) Most courts, including our own, however, review the entire record—including proceedings after the purported invocation of the right of self-representation—and determine de novo whether the defendant's invocation was knowing and voluntary. (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1224-1225 [259 Cal.Rptr. 669, 774 P.2d 698]; *U.S.* v. *Stewart* (8th Cir. 1993) 20 F.3d 911, 917; *Hendricks* v. *Zenon* (9th Cir. 1993) 993 F.2d 664, 669-670; *Strozier* v. *Newsome* (11th Cir. 1991) 926 F.2d 1100, 1104-1105; *U.S.* v. *Campbell* (1st Cir. 1989) 874 F.2d 838, 846; *U.S.* v. *McDowell* (6th Cir. 1987) 814 F.2d 245, 249; *Evans* v. *State* (Alaska Ct.App. 1991) 822 P.2d 1370, 1374-1375.) Even when the trial court has failed to conduct a full and complete inquiry regarding a defendant's assertion of the right of self-representation, these courts examine the entire record to determine whether the invocation of the right of self-representation and waiver of the right to counsel was knowing and voluntary. (*Hendricks* v. *Zenon, supra,* 993 F.2d at pp. 669-670 [limiting rule to exceptional circumstances]; *Strozier* v. *Newsome, supra,* 926 F.2d at p. 1105; *U.S.* v. *McDowell, supra,* 814 F.2d at p. 249 [collecting cases]; *Evans* v. *State, supra,* 822 P.2d at pp. 1374-1375.)

On the separate issue of whether the invocation was unequivocal, we have found no California authority directly on point. The issue could be treated as one of fact, as to which the trial court's order is accorded deference if supported by substantial evidence, or it could be treated as primarily a question of law, subject to de novo review. Cases from other jurisdictions of which we are aware indicate that de novo review of the entire record is common. (*U.S.* v. *Treff, supra,* 924 F.2d at pp. 978-979; *Cross* v. *U.S., supra,* 893 F.2d at p. 1291 [reviewing the record to determine the defendant's actual intent]; *Jackson* v. *Ylst, supra,* 921 F.2d at pp. 888-889; *Meeks* v. *Craven, supra,* 482 F.2d at pp. 467-468; *State* v. *Langford* (1994) 267 Mont. 95 [882 P.2d 490, 493-494] [standing alone, the defendant's request appeared unequivocal, but viewing the record as a whole, the reviewing court concluded it was not]; *State* v. *Williams, supra,* 434 S.E.2d at p. 597; *Reese* v. *State, supra,* 391 N.W.2d at pp. 723-724; see also *Dorman* v. *Wainwright, supra,* 798 F.2d at pp. 1366-1367 [applying an objective standard, the defendant has invoked the right of self-representation when a reasonable person would find that his or her request was a clear and unequivocal invocation of that right]; but see *Fields* v. *Murray, supra,* 49 F.3d at pp. 1032-1034 [treating equivocation as a question of fact].)[2] We have found no case that declares that unless the trial court made a factual finding on the

---

[2]With respect to the distinct question whether a trial court abused its discretion in denying a *Faretta* motion as untimely, we explained in *People* v. *Moore* (1988) 47 Cal.3d 63, 80 [252 Cal.Rptr. 494, 762 P.2d 1218], that the trial court's determination of untimeliness necessarily

record explaining its reason for denying a motion for self-representation, the reviewing court must conclude that no proper basis existed for denying the motion or that the defendant's right of self-representation was infringed. (See *State* v. *Williams, supra,* 434 S.E.2d at pp. 595-597 [defendant's words and actions rendered his motion equivocal; reviewing court approved the denial of a motion for self-representation even though the trial court clearly treated defendant's motion as a *Faretta* motion and rejected it on other, improper grounds].)

■ In any event, there is no support for the defendant's narrowly formulated standard of review. We need not determine whether de novo review or substantial evidence review is appropriate, for under either standard, defendant's claim fails. The statements of defendant at the February 23, 1988, hearing do not constitute an unequivocal invocation of the right of self-representation simply because the trial court described the motion as one for self-representation, or because the trial court failed to make an express finding on the record that the request was equivocal, insincere, or made for the purpose of delay. When we examine the record of the hearing at which defendant assertedly invoked his right of self-representation, we conclude that the request was ambivalent in the context of that hearing and also was made to delay and disrupt the proceedings.

Defendant's statement indicates he was upset over the court's order that he supply blood and other samples of bodily tissue, and over his counsel's role in securing that order. He attempted to secure counsel's dismissal before the order could be entered, and it appears that his request for self-representation was advanced simply as a means to avoid being required to supply the samples, rather than out of a sincere desire to forego counsel and represent himself. Certainly, defendant's statement also contains language suggesting that he had decided that if he was going to die, he would die on his own terms, and that he wanted to "take the pro per status." The court understood his words; it asked why defendant wanted to relieve counsel and defend himself, and it ultimately denied that motion, which it characterized as being for self-representation. But, as we have explained above, the court's duty goes beyond determining that some of defendant's words amount to a motion for self-representation. The court should evaluate all of a defendant's words and conduct to decide whether he or she truly wishes to give up the

---

must be evaluated as of the date and circumstances under which the court made its ruling; a trial court's reasonable and proper determination that such a motion is untimely does not become erroneous simply because, for example, an imminent trial ultimately is postponed. By contrast, subsequent events and circumstances may shed light on the question whether a defendant's interjection of a brief and impulsive request to proceed pro se actually represents a knowing, voluntary, and unequivocal request for self-representation or, instead, a temporary reaction to an adverse circumstance.

right to counsel and represent himself or herself and unequivocally has made that clear.

The quoted statement offered by defendant in the present case was rambling and laced with requests for time to think and allusions to extraneous matters such as the funding of the Norwalk court and the order for tissue samples. It does not convey an unmistakable desire to forego counsel and resume the duties defendant had found impossible to shoulder earlier in the proceedings. We may assume that the judge to whom the case had been assigned for trial, and who already had conducted a hearing with regard to defendant's competency, was also aware of the clerk's docket entries from the previous hearings indicating that defendant had once invoked his right of self-representation and then immediately changed his mind, that he had later invoked the right to counsel, then after five months of continuances had relinquished it. These docket entries also reflected defendant's repeated request for advisory counsel while he was representing himself, indicating further ambivalence on his part about waiving the right to counsel.

There was not only equivocation, but also evidence that defendant's purpose was delay and disruption of the proceedings, and that after his failed experience in representing himself, he no longer had a sincere interest in waiving his right to counsel. During most of the period in which he represented himself, he made persistent efforts to secure the assistance of advisory counsel or cocounsel because, as he perceived, he was unable to handle his own case effectively. Judge Cowell's concern that defendant was employing the assertion of *Faretta* rights as a way station in his attempt to get rid of the public defender and secure private counsel appears to have been well founded. Defendant's asserted mental crises, occurring just when the much-delayed trial actually was to begin, support the inference that delay of the trial was one of defendant's objectives. That defendant ultimately accepted the substitution of Mr. Slick as counsel, and that defendant's eleventh hour attack on Mr. Slick on the day of trial was for the purpose of obtaining a further substitution of counsel rather than self-representation, reinforces our view that defendant's motion for self-representation on February 23, 1988, was not unequivocal or premised upon a sincere desire to act as his own counsel.[3] Rather, it appears defendant attempted to subvert the orderly administration of justice by "juggling his *Faretta* rights with his right to counsel interspersed with *Marsden* motions" (*People* v. *Williams, supra,* 220 Cal.App.3d at p. 1170), along with possible efforts to mislead the court with respect to his mental competency.

[3]Several courts have referred to the failure of a defendant to renew a request for self-representation as evidence that the motion was equivocal. (See *Reese* v. *Nix, supra,* 942 F.2d at p. 1281; *Jackson* v. *Ylst, supra,* 921 F.2d at p. 889; *State* v. *Williams, supra,* 434 S.E.2d at p. 598; *Reese* v. *State, supra,* 391 N.W.2d at pp. 723-724.)

We conclude that defendant's statements did not represent an unequivocal and sincere invocation of the right of self-representation, and that they were made for the purpose of delay rather than in a sincere effort to secure self-representation. Accordingly, the trial court's February 23, 1988, ruling provides no basis for reversing the judgment.

## B. *Severance*

██ The information charged six counts against defendant. Counts I, II, and III alleged the offenses against Sharon Rawls; counts IV, V, and VI alleged the crimes against Durneall H. The court denied defendant's pretrial motion to sever counts I, II, and III from counts IV, V, and VI. Defendant contends the trial court abused its discretion in denying his motion to sever. We disagree.

As defendant concedes, the charged offenses satisfied all of the statutory requirements for joinder. (§ 954.) ██ When the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish an abuse of discretion by the trial court. (*People* v. *Davis* (1995) 10 Cal.4th 463, 508 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People* v. *Price* (1991) 1 Cal.4th 324, 388 [3 Cal.Rptr.2d 106, 821 P.2d 610].) We review the trial court's decision "in light of the showings then made and the facts then known." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 171 [222 Cal.Rptr. 184, 711 P.2d 480].)

The preliminary hearing evidence available to the trial court when it denied defendant's motion to sever showed certain similarities between the two incidents. Durneall H. was attacked in the same area as Sharon Rawls one month before Rawls was killed. During the attack on H., she was dragged towards the same abandoned apartment building in which Rawls's body was later found. H. was strangled, so was Rawls. H. was told by her attacker that he intended to rape and kill her; there was evidence that the attack on Rawls too was sexually motivated. A bus pass belonging to H. and taken from her during the attack was found in defendant's room; a letter belonging to Rawls was found in defendant's possession when police detained him as he was leaving the building where Rawls's body was found.

██ Whether a trial court abused its discretion in denying a motion to sever necessarily depends upon the particular circumstances of each case. (*People* v. *Sandoval* (1992) 4 Cal.4th 155, 172 [14 Cal.Rptr.2d 342, 841 P.2d 862]; *People* v. *Price, supra,* 1 Cal.4th at p. 388.) The pertinent factors are these: (1) would the evidence of the crimes be cross-admissible in separate trials; (2) are some of the charges unusually likely to inflame the jury against

the defendant; (3) has a weak case been joined with a strong case or another weak case so that the total evidence on the joined charges may alter the outcome of some or all of the charged offenses; and (4) is any one of the charges a death penalty offense, or does joinder of the charges convert the matter into a capital case. (*People* v. *Sandoval, supra*, at pp. 172-173.) A determination that the evidence was cross-admissible ordinarily dispels any inference of prejudice. (*People* v. *Arias* (1996) 13 Cal.4th 92, 126 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People* v. *Mason* (1991) 52 Cal.3d 909, 934 [277 Cal.Rptr. 166, 802 P.2d 950].)

 Evidence that H. was attacked in the same general location as Rawls, one month before the murder of Rawls, in apparently the same manner and with the same apparent objective of sexual gratification, would have been admissible in a trial of the Rawls counts to show identity, intent and motive. (Evid. Code, § 1101, subd. (b).) And, for similar purposes, the evidence of the attack on Rawls would have been admissible in a separate trial of the H. counts. The evidence of the two attacks is probative of a common method or approach sufficient to support cross-admissibility. (See, e.g., *People* v. *Sully* (1991) 53 Cal.3d 1195, 1222-1223 [283 Cal.Rptr. 144, 812 P.2d 163] [evidence is cross-admissible when offenses share "common marks" having substantial degree of distinctiveness].)

Evaluation of the remaining three factors—the likelihood of inflaming the jury, the joinder of a strong case with a weak case, and the joinder of noncapital charges with a death penalty case—also supports the trial court's denial of defendant's motion to sever. The evidence of the crimes against H. was not such that it was unusually likely to inflame the jury against defendant with respect to the crimes against Rawls. The offenses were similar; they involved sexually motivated attacks on women in the same area and perpetrated in a similar manner. Moreover, this is not a case in which weaker charges were joined with strong charges so that the effect of the aggregate evidence might alter the outcome of the trial. The evidence of defendant's involvement in the attack on H. and in the attack on Rawls was substantial. Finally, the joinder of a death penalty case with noncapital charges does not by itself establish prejudice. (*People* v. *Lucky* (1988) 45 Cal.3d 259, 277-278 [247 Cal.Rptr. 1, 753 P.2d 1052].)

We conclude that defendant has not shown that the trial court abused its discretion when it denied his pretrial motion to sever. And, given the cross-admissibility of the evidence pertaining to H. and Rawls, we also conclude that defendant has not established that joinder "actually resulted in 'gross unfairness' amounting to a denial of due process." (*People* v. *Arias, supra*, 13 Cal.4th at p. 127; see also *People* v. *Davis, supra*, 10 Cal.4th at p. 509.)

## IV. COMPETENCY TO STAND TRIAL

### A. *Facts*

Before trial, the trial court held two hearings to determine defendant's mental competency to stand trial. (§ 1368.)

The first hearing, without a jury, occurred on February 16, 1988. Dr. Winifred Meyer, a psychoanalyst, testified for defendant. Dr. Meyer had tried to interview defendant, but he refused to talk to her. In her opinion, defendant was not competent to stand trial. She based that view on her observations of him in the interview room and on discussions she had about defendant with guards at the jail. At the conclusion of Dr. Meyer's testimony, the defense rested and the trial court ruled that the defense had failed to meet its burden of proving defendant's incompetence to stand trial.

The second competency hearing, before a jury, took place on May 10 and 11, 1988. Defense witness Dr. William Vicary, a psychiatrist, testified that he had attempted to interview defendant at the jail on four different occasions. At the first three attempted interviews, defendant called Dr. Vicary names, threatened him, and demanded to be taken back to his cell. At the fourth interview, defendant initially said that he did not want to talk to Dr. Vicary. When the latter wanted to know the basis for that refusal, defendant proceeded to talk nonstop in a rambling manner for approximately 15 minutes. He said that he was receiving religious communications from someone called the "narrator," that there was a conspiracy to kill him, that he thought his attorney and Dr. Vicary were part of the conspiracy, and that the conspiracy was funded by $8 million.

At the conclusion of the fourth interview, Dr. Vicary formed the opinion that defendant was not faking incompetence. Defendant's symptoms matched those exhibited by psychotic patients in general, such as delusional ideas, religious paranoia, and rambling speech. To find out how defendant conducted himself outside the presence of a psychiatrist, Dr. Vicary talked to the deputies at the jail. They described defendant's jail conduct as similar to that he exhibited in his fourth interview with Dr. Vicary.

Dr. Vicary also stated that to some extent defendant was capable of understanding the nature and purpose of the legal proceedings and his status in relation to those proceedings. According to Dr. Vicary, defendant's ability to assist his attorney was impaired because defendant's thinking would become delusional when asked about the details of his case. In Dr. Vicary's view, defendant was "legitimately nuts."

On cross-examination by the prosecution, Dr. Vicary described defendant as fairly intelligent and articulate. He also said that his opinion of defendant's competence would have been affected if jail personnel had told him of normal behavior by defendant when outside the presence of a psychiatrist; that it was "certainly a possibility" that defendant could, if he so desired, cooperate with his attorney; and that certain documents prepared by defendant when he was representing himself from December 19, 1986, to May 13, 1987, indicated an ability to assist in his own defense.

Defense counsel, out of the jury's presence, then called defendant as a witness. Defendant, however, refused to testify.

Dr. Michael Coburn, a psychiatrist, testified for the prosecution. When Dr. Coburn first met defendant, the latter was agitated and refused to be interviewed. If Dr. Coburn had to give an opinion, it would be that defendant was probably incompetent, but he added that it was not clear defendant was incompetent and that his opinion lacked "a level of reasonable medical certainty." He did find a strong manipulative component to defendant's conduct.

The prosecution's next witness was Deputy Sheriff Rick Allen, the courtroom's bailiff. Allen testified that in the course of his duties in the past two and one-half to three years he had become acquainted with defendant; he had seen defendant in the courtroom or in the "lockup area" twenty to twenty-five times. Defendant had appeared coherent when arguing legal motions while representing himself, and acted in a "totally rational" manner in the three days preceding the competency hearing while in the lockup facility. Two months earlier, however, defendant had acted "really crazy." The day before the competency hearing, Deputy Allen asked defendant how he was doing at the jail, and defendant replied that he was doing fine. Defendant was conversing "normally" and in a low-key fashion. When Deputy Allen remarked, "Well, evidently, you're not insane, Mr. Marshall," defendant smiled and immediately started to ramble incoherently. On the day of the competency hearing, defendant told Allen that if the verdict did not "go his way," there would be a "major fight."

The last prosecution witness was Deputy Sheriff Louis Garcia, who was assigned to the jail where defendant was housed. Over a period of two years, during which Deputy Garcia saw and talked to defendant every day, defendant did not exhibit unusual conduct. On occasion, defendant would mumble when he was transported to the court. No psychiatrist had talked to Deputy Garcia about defendant. The evening before the competency hearing defendant acted normally when he talked to Garcia.

On May 11, 1988, the jury found defendant mentally competent to stand trial.

## B. *Sufficiency of Evidence as to Defendant's Competence to Stand Trial*

■ A defendant who is mentally incompetent cannot be tried or ad-judged to punishment. (§ 1367, subd. (a); *Pate* v. *Robinson* (1966) 383 U.S. 375, 378 [86 S.Ct. 836, 838, 15 L.Ed.2d 815].) A defendant is mentally incompetent to stand trial if, as a result of mental disorder or developmental disability, the defendant is "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) The defendant has the burden of proving incompetency by a preponderance of the evidence. (§ 1369, subd. (f); *People* v. *Medina* (1990) 51 Cal.3d 870, 881-886 [274 Cal.Rptr. 849, 799 P.2d 1282].)

■ Defendant contends there is insufficient evidence to support the jury's verdict finding him competent to stand trial. Citing *People* v. *Samuel* (1981) 29 Cal.3d 489 [174 Cal.Rptr. 684, 629 P.2d 485], defendant argues that a judgment of conviction must be reversed when there is "persuasive and virtually uncontradicted" evidence of a defendant's mental incompe-tence (*id.* at p. 506). We agree. He then asserts that the evidence in this case, in which unanimous expert testimony was contradicted only by lay testi-mony, is "persuasive and virtually uncontradicted" evidence of mental in-competency. We disagree.

■ In reviewing a jury verdict that a defendant is mentally competent to stand trial, an appellate court must view the record in the light most favorable to the verdict and uphold the verdict if it is supported by substan-tial evidence. (*People* v. *Samuel, supra,* 29 Cal.3d at p. 505.) Evidence is substantial if it is reasonable, credible, and of solid value. (*Ibid.*; *People* v. *Bassett* (1968) 69 Cal.2d 122, 137 [70 Cal.Rptr. 193, 443 P.2d 777].)

■ Here, substantial evidence supports the jury's verdict finding defend-ant competent to stand trial. Contrary to defendant's assertion, the jury did not have to accept the opinion of experts. As we have observed in the past: "Of course, the jury is not required to accept at face value a unanimity of expert opinion: 'To hold otherwise would be in effect to substitute a trial by "experts" for a trial by jury . . . .' " (*People* v. *Samuel, supra,* 29 Cal.3d at p. 498, quoting *People* v. *Wolff* (1964) 61 Cal.2d 795, 811 [40 Cal.Rptr. 271, 394 P.2d 959].)

■ The value of an expert's opinion depends upon the quality of the material on which the opinion is based and the reasoning used to arrive at the

conclusion. (*Slaten* v. *State Bar* (1988) 46 Cal.3d 48, 55 [249 Cal.Rptr. 289, 757 P.2d 1]; *People* v. *Samuel, supra,* 29 Cal.3d at p. 498.) ▮ Here, both expert witnesses, Dr. Vicary and Dr. Coburn, based their opinions regarding defendant's competence to stand trial primarily on their interviews with defendant. They said that their opinions would be affected by evidence that defendant acts normally outside the setting of a psychiatric interview. Court Bailiff Allen and Deputy Sheriff Garcia testified to such behavior by defendant. Defendant's interview with Dr. Vicary lasted only 15 minutes; defendant refused to be interviewed by Dr. Coburn. In addition, both experts had reservations regarding their expressed views of defendant's incompetence. Dr. Vicary stated that it was possible that defendant could cooperate with his attorney if he wanted to do so. And Dr. Coburn said that his opinion that defendant was incompetent lacked "a level of reasonable medical certainty." Also, defendant's conduct while he was representing himself supported a finding of mental competency: The written motions defendant prepared while representing himself were appropriate, and Deputy Sheriff Allen stated that defendant's oral presentation of his motions in court was coherent.

In *People* v. *Samuel, supra,* 29 Cal.3d 489, we reversed for insufficiency of evidence a jury's verdict finding the defendant in that case competent to stand trial. But *Samuel* is factually distinguishable from this case. In *Samuel,* five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians testified that the defendant was incompetent to stand trial. This testimony was supported by four psychiatric reports, and the prosecution's witnesses did not contradict any of the defense testimony. (*Id.* at pp. 497-498.) Here, in contrast, only two experts testified regarding defendant's incompetence to stand trial. As set forth above, their opinions were tenuous, and they were undermined by the testimony of the prosecution's lay witnesses, Deputy Sheriff Rick Allen and Deputy Sheriff Louis Garcia, who testified to their observations of defendant during a two-to-three-year period. We conclude that the evidence presented to the jury was sufficient to support the jury's verdict that defendant was competent to stand trial.

C. *Defendant's Mental Competency During Trial*

▮ Notwithstanding the jury's finding that defendant was mentally competent to stand trial, defendant argues that his conviction should be reversed because the trial court did not, on its own initiative, make a renewed inquiry into defendant's mental competency during and after the trial. Specifically, he asserts that the court was required to make further inquiries because reasonable doubts about his mental competence were

raised by statements he made in court before jury selection, to a probation officer before sentencing, and in court after denial of the statutorily mandated motion for modification of the verdict of death (§ 190.4, subd. (e)). In support, defendant points to certain unusual statements he made before jury selection about his having large amounts of money and being born in Spain; statements he made to the probation officer to the effect that he was a god, that the President and Governor were conspiring against him, and that the conspirators would be beheaded; and statements he made after trial about attorneys and other trial participants previously involved in his life, about the court's loss of its budget, and about himself being the victim of entrapment.

When, as here, a competency hearing has already been held and the defendant was found to be competent to stand trial, a trial court is not required to conduct a second competency hearing unless "it 'is presented with a substantial change of circumstances or with new evidence'" that gives rise to a "serious doubt" about the validity of the competency finding. (*People* v. *Jones* (1991) 53 Cal.3d 1115, 1153 [282 Cal.Rptr. 465, 811 P.2d 757].) More is required than just bizarre actions or statements by the defendant to raise a doubt of competency. (*People* v. *Danielson* (1992) 3 Cal.4th 691, 727 [13 Cal.Rptr.2d 1, 838 P.2d 729], quoting *People* v. *Deere* (1985) 41 Cal.3d 353, 358 [222 Cal.Rptr. 13, 710 P.2d 925].) In addition, a reviewing court generally gives great deference to a trial court's decision whether to hold a competency hearing. As we have said: "'An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.'" (*People* v. *Danielson, supra,* 3 Cal.4th at p. 727, quoting *People* v. *Merkouris* (1959) 52 Cal.2d 672, 679 [344 P.2d 1].)

We cannot say as a matter of law that here defendant's statements in question were a "substantial change of circumstances" requiring the trial court to hold a second competency hearing. As noted above, a defendant's bizarre statements, standing alone, are not sufficient. We conclude that the trial court did not abuse its discretion when it determined that the statements failed to establish a substantial change of circumstances. (*People* v. *Kelly* (1992) 1 Cal.4th 495, 543 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

## V. GUILT ISSUES

### A. *Sufficiency of Evidence*

Defendant contends that the evidence is insufficient to support his convictions for the robbery, attempted rape, and murder of

Sharon Rawls.[4] ▮ In resolving claims involving the sufficiency of evidence, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560], italics in original; *People* v. *Rowland* (1992) 4 Cal.4th 238, 269 [14 Cal.Rptr.2d 377, 841 P.2d 897]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) The supporting evidence must be substantial, that is, "evidence that 'reasonably inspires confidence and is of "solid value." ' " (*People* v. *Morris* (1988) 46 Cal.3d 1, 19 [249 Cal.Rptr. 119, 756 P.2d 843], quoting *People* v. *Bassett*, *supra*, 69 Cal.2d 122, 139.)

As we shall explain, the evidence is insufficient to support the robbery conviction, but is sufficient to support the convictions for attempted rape and first degree murder.

### 1. *Robbery*

▮ Robbery is defined as the taking of personal property of some value, however slight, from a person or the person's immediate presence by means of force or fear, with the intent to permanently deprive the person of the property. (§ 211; *People* v. *Harris* (1994) 9 Cal.4th 407, 415 [37 Cal.Rptr.2d 200, 886 P.2d 1193].) ▮ To support a robbery conviction, the evidence must show that the requisite intent to steal arose either before or during the commission of the act of force. (*People* v. *Morris*, *supra*, 46 Cal.3d at p. 19.) "[I]f the intent arose only after the use of force against the victim, the taking will at most constitute a theft." (*Ibid.*) The wrongful intent and the act of force or fear "must concur in the sense that the act must be motivated by the intent." (*People* v. *Green* (1980) 27 Cal.3d 1, 53 [164 Cal.Rptr. 1, 609 P.2d 468]; see § 20; Hall, General Principles of Criminal Law (2d ed. 1960) pp. 185-190.)

▮ The evidence here is not sufficient to establish the necessary concurrence of intent to steal and the act of force. The only property that defendant took from Sharon Rawls was a letter to her from a grocery responding to her request for a check-cashing card. (The letter was in defendant's possession when the police detained him.) There is no evidence that defendant killed Rawls for the purpose of obtaining this letter from her. Although the condition of Rawls's body and the cause of death establish use of force against Rawls, they do not suggest or give rise to an inference that the force was exerted to obtain the letter.

---

[4]Defendant has not challenged his convictions for the crimes committed against Durneall H.

To support the argument that the evidence was sufficient to establish robbery, the Attorney General relies on a theory first articulated by the prosecutor at trial. In his closing argument to the jury, the prosecutor hypothesized that defendant, when he killed Rawls, intended to collect a token or souvenir from his victim. Thus, under the prosecutor's theory, defendant had the requisite intent to steal at the time of the act of force against Rawls, even if the force was directed towards the criminal objective of rape rather than the taking of property. In support of this theory, the prosecutor pointed out that defendant had taken a bus pass from another victim, Durneall H., when he assaulted her, suggesting that the taking of the bus pass supported an inference that defendant's method of committing crimes included a preexisting intent to acquire a token or memento from his victims. We disagree. Defendant did not take the bus pass from H. to serve as a memento of the crime. H. testified that the bus pass fell out of her pocket in the course of her struggle with defendant. Defendant then picked up the bus pass and put it in his pocket. One may logically and reasonably infer from this evidence (Evid. Code, § 600, subd. (b)) that defendant intended to deprive H. of the bus pass, but not that he took the pass as a memento of his crime against H.

Defendant's possession of the letter written to Rawls by the grocery market supports an inference that he took the letter from Rawls or her immediate presence, but is not evidence that "reasonably inspires confidence" (*People* v. *Morris*, *supra*, 46 Cal.3d at p. 19) that defendant killed Rawls for the *purpose* of obtaining the letter. If a person commits a murder, and after doing so takes the victim's wallet, the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money. In this case, however, the letter taken by defendant was, in the prosecutor's words, an "insignificant piece of paper." The prosecution offered no evidence tending to show that the grocery's letter responding to Rawls's request for a check-cashing card was so valuable to defendant that he would be willing to commit murder to obtain it. Accordingly, defendant's possession of the letter does not constitute evidence of sufficient "solid value" (*ibid.*) to support the conclusion that defendant killed Rawls so that he could obtain possession of the letter. The prosecution's argument to the contrary is based purely on speculation. As we have said before, mere speculation cannot support a conviction. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 500 [116 Cal.Rptr. 217, 526 P.2d 225]; *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) To be legally sufficient, evidence must be reasonable, credible, and of solid value. (*People* v. *Johnson*, *supra*, 26 Cal.3d at p. 578.)

For the reasons set forth above, we conclude there is insufficient evidence to support defendant's conviction for the robbery of Sharon Rawls, thus requiring reversal of that conviction.

### 2. *Attempted rape of Sharon Rawls*

 Defendant was originally charged with the forcible rape of Sharon Rawls. Thereafter, on defendant's pretrial motion (see § 995), the trial court found the evidence insufficient to hold defendant to answer for the charge of rape, but sufficient to hold him to answer for the charge of attempted forcible rape. Defendant contends that the evidence adduced at trial does not support his conviction for the attempted rape of Rawls. We disagree.

Forcible rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator against the person's will by means of force or violence. (§ 261, subd. (a)(2).) An attempt to commit a crime occurs when the perpetrator, with the specific intent to commit the crime, performs a direct but ineffectual act towards its commission. (§ 21a; *People v. Dillon* (1983) 34 Cal.3d 441, 452-453 [194 Cal.Rptr. 390, 668 P.2d 697]; see CALJIC No. 6.00 (5th ed. 1988).)

 Defendant's prior attack on Durneall H. and the attack on Sharon Rawls shared certain similarities (see, e.g., *People v. Sully, supra,* 53 Cal.3d at pp. 1222-1223 [evidence of other offenses sharing a number of "common marks" admissible to show identity]), including the condition in which Rawls's body was found, and the circumstances surrounding defendant's arrest. Rawls was killed in an abandoned apartment building. A month earlier, while assaulting and dragging Durneall H. towards that same building, defendant told H. that he was going to rape and kill her, but H. managed to break free. Rawls's body was found with her underwear and pants pulled down, and she had abrasions on her neck, face and arms. Defendant was detained at the building shortly after the murder of Rawls was committed, the grocery market's letter to Rawls was found in his possession, and the stains of blood consistent with Rawls's blood type were on his sweatshirt. Considered together, the evidence was sufficient to support defendant's conviction of attempted rape of Sharon Rawls.

### 3. *First degree murder of Sharon Rawls*

 The trial court instructed the jury that it could convict defendant of first degree murder if it determined that he premeditatedly and deliberately killed Sharon Rawls, or if it found, under the felony-murder rule, that he killed Rawls in the course of a robbery or an attempted rape. (§ 189.) Defendant argues that the evidence is insufficient to support his conviction for first degree murder under the felony-murder rule on the theories of either robbery murder or attempted-rape murder, and that this court must therefore reverse his murder conviction.

Because, as previously explained, the evidence in this case is insufficient to support defendant's robbery conviction, it is also insufficient to support the conclusion that the murder occurred in the perpetration or attempt to perpetrate a robbery. (*People* v. *Green, supra*, 27 Cal.3d at p. 52.) Thus, the first degree murder conviction cannot be sustained on the theory that the murder was committed in the course of robbery.

The first degree murder conviction can be sustained, however, on the theory that the killing occurred in the course of an attempted rape. As we stated earlier, sufficient evidence supports defendant's conviction for attempted rape. The evidence is also sufficient to support defendant's conviction for first degree murder based on the felony of attempted rape. The condition of Sharon Rawls's body and clothing supports an inference of an ineffectual attack directed towards sexual intercourse. The sexual nature of the attack is shown by her body being found with her underwear and pants pulled down; the existence of a struggle is evidenced by the abrasions on her neck, face, and arms. The identification of defendant as the perpetrator is supported by the evidence of his having been seen in and leaving the building where Sharon Rawls was killed shortly after the murder, the fresh abrasions on his elbow and the injury to his right hand indicating participation in a struggle, and the bloodstains on his sweatshirt consistent with the victim's blood type. This evidence, combined with Rawls's screams, the gag found in her mouth, and the pathologist's testimony that she was strangled, are an ample basis upon which a rational trier of fact could find that defendant killed Rawls while engaged in the attempt to perpetrate a forcible rape.

Accordingly, we conclude that defendant's first degree murder conviction is supported by substantial evidence.

## B. *First Degree Murder Conviction Based on Allegedly Inadequate Theory*

Defendant contends that his first degree murder conviction must be reversed because one of the theories upon which it may have been based is inadequate. He argues that because the evidence he killed Sharon Rawls in the course of a robbery is insufficient to support his murder conviction, and because this court cannot ascertain whether the jury based its decision to convict him of murder on that ground, the murder conviction must be reversed. (See *People* v. *Green, supra*, 27 Cal.3d at p. 69.) Contrary to defendant's assertion, however, this court can determine that the jury based its decision on a valid legal theory.

In *People* v. *Guiton* (1993) 4 Cal.4th 1116 [17 Cal.Rptr.2d 365, 847 P.2d 45], we distinguished cases in which the prosecution relied on a *factually*

inadequate theory from those in which the prosecution's theory was *legally* inadequate. We held that if the inadequacy of proof is purely factual, "reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*Id.* at p. 1129.) We further held that if the inadequacy is legal, the "rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (*Ibid.,* fn. omitted.)

Because it is possible here to determine from the record that the jury necessarily found defendant guilty on a proper theory (*People* v. *Guiton, supra,* 4 Cal.4th at p. 1130; see *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913]), there is no need to characterize the claimed inadequacy as either factual or legal. The jury found true the special circumstance allegation that defendant killed Rawls during the attempted commission of a rape. Because a jury must unanimously agree that a special circumstance finding is true (§ 190.4), and the jury in this case was so instructed, the jury's finding that defendant killed Rawls in the course of committing an attempted rape indicates that the jury unanimously found defendant guilty of first degree murder on the valid theory that the killing occurred during the attempted commission of a rape.

C. *Instruction on Battery as a Lesser Included Offense of Attempted Rape*

██ The jury found defendant guilty of attempted forcible rape of Sharon Rawls. (§§ 664, 261, subd. (a)(2).) Defendant argues that battery is a lesser offense necessarily included in the crime of attempted rape, and therefore the trial court should, on its own motion, have instructed the jury on battery. The failure to do so, he asserts, entitles him to a reversal of his conviction for attempted rape.

When, as here, the accusatory pleading describes a crime in the statutory language, an offense is necessarily included in the greater offense when the greater offense cannot be committed without necessarily committing the lesser offense. (*People* v. *Mincey* (1992) 2 Cal.4th 408, 452 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Thus, battery would be a lesser included offense of attempted rape only if it were impossible to commit the greater crime of attempted rape without also committing the lesser offense of battery. (See *People* v. *Wolcott* (1983) 34 Cal.3d 92, 99 [192 Cal.Rptr. 748, 665 P.2d 520].)

Section 242 defines battery as "any willful and unlawful use of force or violence upon the person of another." Therefore, a battery cannot be accomplished without a touching of the victim. (*People* v. *Longoria* (1995) 34

Cal.App.4th 12, 16 [40 Cal.Rptr.2d 213].) In contrast, an *attempted* forcible rape does not require a touching of the victim. An attempt to commit a crime occurs when there is an effort to commit the crime that fails, or is prevented or intercepted. (§ 664.) Forcible rape is an act of sexual intercourse accomplished "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).) Thus, an attempted forcible rape is an unsuccessful effort directed towards accomplishing an act of sexual intercourse by force or fear. Such an attempt could occur without a touching. For example, an attempted forcible rape would occur if a defendant pointed a gun at a woman and ordered her to submit to sexual intercourse, but the woman managed to escape without having been touched. Because, as just shown, attempted forcible rape can be committed without also necessarily committing the lesser crime of battery, it follows that the latter is not an offense necessarily included in the former. Accordingly, the trial court did not err when it did not on its own initiative instruct the jury on battery being a lesser included offense of attempted rape.

## D. *Trial Court's Refusal to Give Defendant's Requested Instructions*

Defendant faults the trial court for refusing to give jury instructions on aider and abettor liability, a special circumstance instruction referring to defendant as an accomplice, and an instruction telling the jury that it should not consider why another person was not being prosecuted. He contends that such instructions were required because evidence showed that an "other man" was seen leaving the building in which Sharon Rawls's body was found shortly before the police saw defendant at the building.

Defendant requested instructions defining principals (CALJIC No. 3.00 (1984 rev.)), aiding and abetting (CALJIC No. 3.01 (1984 rev.)), and first degree felony-murder liability as an aider and abettor (CALJIC No. 8.27 (1984 rev.)). Defense counsel also asked that the introductory instruction on special circumstances (CALJIC No. 8.80 (1984 rev.)) include paragraphs stating that if defendant was an accomplice and not the actual killer of Rawls, the jury could not find the special circumstance allegations true unless it concluded that defendant acted with intent to kill. In addition, defendant requested a jury instruction (CALJIC No. 2.11.5 (1984 rev.)) that there was evidence of possible involvement of a person other than defendant as to the crimes for which defendant was on trial, but that the jury was not to consider why that person was not being prosecuted. The trial court refused to give the proposed instructions.

A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration. (*People* v. *Williams* (1992) 4 Cal.4th 354, 361 [14 Cal.Rptr.2d 441,

841 P.2d 961]; *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 & fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) As we have stressed in a recent case, "unsupported theories should not be presented to the jury." (*People* v. *Guiton, supra,* 4 Cal.4th at p. 1131.) Here, the trial court correctly determined that the evidence did not support the instructions requested by the defense and therefore should not be given.

 A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People* v. *Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].)

 Defendant notes that because shortly after the murder of Sharon Rawls a man other than defendant was seen leaving the abandoned building in which the murder occurred, that man (never located or identified) could have killed Rawls with defendant's assistance. In support, defendant points out that as the man was leaving the building he was holding his shoes in his hand and his hair was in disarray, that he looked nervous when confronted by witness Foster, and that semen belonging to someone other than defendant was found in Rawls's vagina and on her clothes.

This evidence was insufficient to require the trial court to instruct the jury on the possibility that defendant aided and abetted the "other man" in killing Rawls. Because Rawls was a prostitute, the presence on her clothes and in her vagina of semen not belonging to defendant is of little significance. That the "other man" was carrying his shoes in his hand and that his hair was in disarray are facts consistent with his explanation to witness Foster that he had been sleeping in the abandoned building, and his nervousness was understandable given that Foster was a large man wielding a machete. Because defendant's claim that the "other man" might have been involved in the killing rests on pure speculation, rather than substantial evidence, the trial court did not err in refusing to give the instructions requested by defendant.

## VI. SPECIAL CIRCUMSTANCE ISSUES

### A. *Sufficiency of Evidence*

 Defendant asserts that the special circumstance finding of robbery murder must be reversed because the evidence is insufficient to support the jury's finding. We agree. A robbery-murder special circumstance may only

be found true if the murder was committed while the defendant was engaged in "the commission of, or the attempted commission of" a robbery. (§ 190.2, subd. (a)(17)(A).) In this case, as previously explained, the evidence is insufficient to show that defendant killed Rawls during the commission of a robbery, thus requiring reversal of the robbery-murder special-circumstance finding.

Such a reversal would be necessary even if the evidence were sufficient to support defendant's robbery conviction. At trial the prosecution theorized that defendant took from the person of Rawls a letter written to her by a grocery store because he wanted the letter as a token of the rape and killing. Even if supported by the evidence, this theory would not form a proper basis for upholding the robbery-murder special circumstance, because the robbery would merely be incidental to the murder. The robbery-murder special circumstance applies to a murder in the commission of a robbery, not to a robbery committed in the course of a murder. (See, e.g., *People* v. *Kimble* (1988) 44 Cal.3d 480, 500 [244 Cal.Rptr. 148, 749 P.2d 803]; *People* v. *Robertson* (1982) 33 Cal.3d 21, 52 [188 Cal.Rptr. 77, 655 P.2d 279].)

We reject defendant's contention that the attempted-rape-murder special circumstance is not supported by the evidence. As set forth earlier (*ante,* at p. 37), substantial evidence supports the jury's finding that the murder occurred in the commission or attempted commission of a rape. (§ 190.2, subd. (a)(17)(C).)

B. *Intent to Kill*

Defendant contends that the trial court should have instructed the jury that it could not find the special circumstance allegations of robbery murder and attempted-rape murder true unless it found that defendant had an intent to kill Sharon Rawls. Defendant argues that this error requires reversal of the robbery-murder and attempted-rape-murder special circumstances and of the judgment of death. We agree.

In this case, the jury found two special circumstance allegations to be true: robbery murder (§ 190.2, subd. (a)(17)(A)) and attempted-rape murder (§ 190.2, subd. (a)(17)(K)). In 1983, this court held that intent to kill was an element of felony-murder special circumstances whether or not the defendant was the actual killer. (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 153-154 [197 Cal.Rptr. 79, 672 P.2d 862].) Although we overruled *Carlos* in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], holding that the intent-to-kill requirement applied only to an accomplice, not to the actual killer, *Carlos* remained applicable to, and the

trial court was required to instruct the jury on intent to kill in, all cases involving a defendant charged with a felony-murder special circumstance if the offense was committed during the "window" period between our decisions in *Carlos* and *Anderson*. (See, e.g., *People* v. *Fierro* (1991) 1 Cal.4th 173, 227 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People* v. *Ashmus* (1991) 54 Cal.3d 932, 980-981 [2 Cal.Rptr.2d 112, 820 P.2d 214]; *People* v. *Duncan* (1991) 53 Cal.3d 955, 973, fn. 4 [281 Cal.Rptr. 273, 810 P.2d 131].) The murder in this case occurred on April 13, 1986, during the "window" period. Accordingly, the jury in this case could find the robbery-murder and the rape-murder special-circumstance allegations to be true only if it found that defendant acted with intent to kill. The trial court, however, failed to so instruct the jury.

The trial court gave the jury this special circumstance instruction: "To find that the special circumstance, referred to in these instructions as murder in the commission or attempted commission of robbery or rape is true, it must be proved: [¶] (1) That the murder was committed while the defendant was [engaged in] in the [commission] [or] [attempted commission] of a robbery or rape. [¶] 2. That the murder was committed in order to carry out or advance the commission of the crime of robbery or rape or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstances referred to in these instructions is not established if the robbery or attempted rape was merely incidental to the commission of the murder." (Brackets in original.) This instruction did not require the jury to find that defendant intended to kill. (*People* v. *Osband* (1996) 13 Cal.4th 622, 680-681 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People* v. *Whitt* (1984) 36 Cal.3d 724, 734 [205 Cal.Rptr. 810, 685 P.2d 1161].) The Attorney General concedes that the trial court erred, but insists that the error was harmless beyond a reasonable doubt. We conclude that the error was prejudicial.

▉▉▉ The prejudicial effect of a trial court's erroneous failure to instruct the jury on an element of a special circumstance allegation is measured by the "harmless beyond a reasonable doubt" test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]. (*People* v. *Johnson* (1993) 6 Cal.4th 1, 45-46 [23 Cal.Rptr.2d 593, 859 P.2d 673].) This court recently held that "error in failing to instruct that a special circumstance contains a requirement of the intent to kill is harmless [beyond a reasonable doubt] when 'the evidence of defendant's intent to kill . . . was overwhelming, and the jury could have had no reasonable doubt on that matter.' " (*People* v. *Osband, supra*, 13 Cal.4th at p. 681, quoting *People* v. *Johnson, supra*, 6 Cal.4th at pp. 45-46.) ▉▉▉ Although the evidence of intent to kill here is sufficient to support a jury's finding of intent to kill, it is not overwhelming, and the jury could have had a reasonable doubt on the matter.

The evidence of the cause of Sharon Rawls's death does not, contrary to the Attorney General's assertion, show *beyond a reasonable doubt* that defendant intended to kill Rawls. The pathologist, Dr. Sathyavagiswaran, testified (based on the report of another physician who had actually done the autopsy and on photographs taken by others at the crime scene and the autopsy) that the cause of Rawls's death was asphyxia caused by a combination of a ligature gag and compression of the neck. On cross-examination, Dr. Sathyavagiswaran stated that it was possible for a person to die from a ligature gag alone and that small bones in the neck that are often broken during manual strangulation were not fractured in Rawls's neck. From this evidence the jury could reasonably have found that defendant gagged Rawls to quiet her screams for help, without an intent to kill her, and that Rawls choked to death on her gag. (See *People* v. *Balderas* (1985) 41 Cal.3d 144, 199 [222 Cal.Rptr. 184, 711 P.2d 480] [position of fatal wound precludes finding intent to kill as a matter of law].)

Nor does evidence of defendant's attack on Durneall H. approximately one month before the Rawls murder and his statements during that attack that he was going to rape and kill H. establish defendant's intent to kill Rawls *beyond a reasonable doubt*. Because of the similarity between these two incidents, evidence of defendant's attack on H. is relevant to prove that defendant may have intended to kill Rawls. As we discussed in detail earlier, the offenses against H. and Rawls shared certain similarities: they occurred in the same general area, happened late at night, and involved strangling of women. (See generally, Evid. Code, § 1101.) Because of the lapse of time between the two attacks and certain dissimilarities between them, however, it cannot be said that " 'the evidence of defendant's intent to kill . . . was overwhelming, and the jury could have had no reasonable doubt on that matter.' " (*People* v. *Osband, supra*, 13 Cal.4th at p. 681, quoting *People* v. *Johnson, supra*, 6 Cal.4th at pp. 45-46.) (Here, a period of approximately one month elapsed between the attack on H. and the murder of Rawls; H. was not killed, but Rawls was; and defendant made no attempt to gag H., while he did gag Rawls.)

The remaining evidence relied on by the Attorney General likewise is insufficient to establish *beyond a reasonable doubt* that defendant intended to kill Rawls. Contrary to the Attorney General's assertion, there is no evidence that defendant lay in wait, that he forced or lured Rawls into the abandoned building, or that he brought a gag with him to silence Rawls. The Attorney General's reliance on defendant's possession of a knife when he was detained by the police is misplaced. Because a knife was not used in the commission of the murder, defendant's possession of a knife, to the extent it has any probative value, would suggest a lack of intent to kill. Although the

presence of certain nonsevere abrasions on defendant's person and the condition of Rawls's body indicate a struggle, such evidence is as consistent with an attempt to rape Rawls as it is with an intent to kill her.

In short, the evidence and the inferences that may reasonably be drawn from the evidence discussed above do not prove defendant's intent to kill Rawls so overwhelmingly that the jury could not have had a reasonable doubt on the matter. (Cf. *People* v. *Osband, supra,* 13 Cal.4th at p. 682 [evidence of deep stab wound in neck of disabled elderly victim combined with evidence that defendant stabbed victim twice or twisted knife in victim's neck held to be inconsistent with an unintentional homicide]; *People* v. *Johnson, supra,* 6 Cal.4th at pp. 46-47 [intent to kill shown when one victim was strangled and set on fire and the other victim was beaten to death by being kicked 10 to 12 times in the face and head]; *People* v. *Cudjo* (1993) 6 Cal.4th 585, 630 [25 Cal.Rptr.2d 390, 863 P.2d 635] [systematic and prolonged assault with manifestly deadly force on helpless victim held to be consistent with intent to kill].) Consequently, we cannot conclude that the trial court's failure to instruct the jury that intent to kill was an element of the felony-murder special-circumstance allegations was harmless beyond a reasonable doubt. Accordingly, we must reverse the special circumstance findings of robbery and attempted rape.[5] Because there is no other legally valid special circumstance finding, the judgment of death must likewise be reversed. (§ 190.3; see *People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 468 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

## VII. Disposition

The convictions for first degree murder, one count of robbery, two counts of attempted forcible rape, and kidnapping are affirmed. The special circumstance findings are set aside, and the conviction and sentence for the robbery of Sharon Rawls and the judgment of death are reversed.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the judgment insofar as it reverses the conviction and sentence for the robbery of Sharon Rawls and sets aside the special circumstance findings and the sentence of death. I dissent from the judgment, however, insofar as it affirms the other convictions and sentences. I would reverse the trial court's judgment in its entirety because defendant was denied his constitutional right of self-representation.

The majority holds that the trial court acted properly in not allowing defendant to represent himself because defendant's request was equivocal

[5]The robbery-murder special circumstance must be reversed not only for the instructional error described above, but also, as previously explained, for insufficiency of evidence.

and was made for the improper purpose of delaying the trial proceedings. (Maj. opn., *ante*, at p. 26.) The record belies that. Defendant's request was unequivocal, as the trial court clearly understood; furthermore, there is no evidence that it was made to delay the proceedings. In forcing defendant, under these circumstances, to continue with an appointed attorney against his will, the trial court denied defendant his constitutional right to conduct his own defense.

## A. *Constitutional Right to Self-representation*

Under the Sixth and Fourteenth Amendments of the federal Constitution, the accused in a criminal proceeding has a right to the assistance of counsel and the correlative right to proceed *without* counsel. (*Faretta* v. *California* (1975) 422 U.S. 806, 807 [45 L.Ed.2d 562, 95 S.Ct. 2525, 2527].) As the United States Supreme Court explained in *Faretta*: "The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.' Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the [Sixth] Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." (*Id.* at pp. 819-820 [95 S.Ct. at p. 2533], fn. omitted.)

The constitutional right to conduct one's own defense has two characteristics that are often overlooked or misunderstood. First, it is an *independent* constitutional right "found in the structure and history of the constitutional text." (*Faretta* v. *California, supra*, 422 U.S. at pp. 819-820 & fn. 15 [95 S.Ct. at p. 2533].) As the *Faretta* court stated, the right of self-representation is equal, not inferior, to the right to counsel. (*Id.* at p. 832 [95 S.Ct. at p. 2539].)[1]

Second, the choice of self-representation is *personal* to the defendant. "The defendant, and not his lawyer or the State, will bear the personal

[1] The right of self-representation has been a federal statutory right since the founding of our nation. (*Faretta* v. *California, supra*, 422 U.S. at p. 812 [95 S.Ct. at p. 2530].) Moreover, long before its decision in *Faretta* v. *California*, the high court had foreshadowed its recognition of the right of self-representation as a basic *constitutional* right. (*Adams* v. *U.S.* ex rel. *McCann* (1942) 317 U.S. 269, 279 [63 S.Ct. 236, 241-242, 87 L.Ed. 268, 143 A.L.R. 435] [referring to the right to assistance of counsel and the correlative right to dispense with a lawyer's help]; *Snyder* v. *Massachusetts* (1934) 291 U.S. 97, 106 [54 S.Ct. 330, 332, 78 L.Ed. 674, 90 A.L.R. 575] [noting a criminal defendant's power "to supersede his lawyers altogether and conduct

consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage." (*Faretta* v. *California, supra,* 422 U.S. at p. 834 [95 S.Ct. at p. 2541].) Indeed, the high court has said that the right to self-representation "exists to affirm the accused's individual dignity and autonomy." (*McKaskle* v. *Wiggins* (1984) 465 U.S. 168, 178 [104 S.Ct. 944, 951, 79 L.Ed.2d 122].) Therefore, so long as the defendant is mentally competent, it is irrelevant whether others consider the defendant's decision unwise. (*Godinez* v. *Moran* (1993) 509 U.S. 389, 399 [113 S.Ct. 2680, 2686, 125 L.Ed.2d 321]; *Faretta* v. *California, supra,* at p. 836 [95 S.Ct. at pp. 2541-2542].) Just as important, it matters not what the defendant's motivation is unless it is a desire to disrupt the trial proceedings. (See *Adams* v. *Carroll* (9th Cir. 1989) 875 F.2d 1441, 1444-1445; *Ferrel* v. *Superior Court* (1978) 20 Cal.3d 888, 891-892 [144 Cal.Rptr. 610, 576 P.2d 93].) Thus, a defendant's invocation of the right to self-representation is valid even if asserted in response to a trial court's ruling the defendant did not like. (*Adams* v. *Carroll, supra,* at p. 1445 [defendant's assertion of right to self-representation conditioned on, and in reaction to, court order does not make assertion equivocal].)

A trial court must honor a request for self-representation when the defendant unequivocally asserts it within a reasonable time before trial and does not do so to delay or disrupt the proceedings. (See, e.g., *People* v. *Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187]; *U.S.* v. *George* (9th Cir. 1995) 56 F.3d 1078, 1084; *Adams* v. *Carroll, supra,* 875 F.2d at p. 1444; *U.S.* v. *Flewitt* (9th Cir. 1989) 874 F.2d 669, 674.)

Here, defendant unequivocally asserted his right to defend himself, and there is no evidence that he did so to delay or disrupt the proceedings, as discussed below.[2]

B. *Unequivocal Assertion of Right to Self-representation*

On February 10, 1988, after proceedings before other trial judges, this case was assigned to Judge Richard Kalustian. Six days later, Judge Kalustian found defendant competent to stand trial.

---

the trial himself"].) The *Faretta* court specifically noted that the constitutions of 36 states explicitly confer that right. (422 U.S. at p. 813 [95 S.Ct. at p. 2530].)

In the history of British criminal jurisprudence, only one tribunal had a practice of forcing counsel upon an unwilling defendant. That tribunal was the notorious Star Chamber, an efficient but arbitrary arm of royal power, which flourished during the late 16th and early 17th centuries and, because of its departure from common law traditions, came to symbolize disregard of basic individual rights. (*Faretta* v. *California, supra,* 422 U.S. at p. 821 & fn. 17 [95 S.Ct. at p. 2535].)

[2]Defendant invoked his right of self-representation six weeks before the then scheduled date for trial. The majority does not dispute that the assertion was timely.

On February 23, 1988, defendant appeared with counsel before Judge Kalustian. After the court set a trial date of April 5, 1988, defense counsel made an ex parte motion that defendant be ordered to provide samples of his blood, saliva, hair, and fingernails to assist counsel in preparing the defense case. Defense counsel informed the court that the motion was against the wishes of defendant, who perceived the motion as "not helping him" and therefore wanted "to go pro per at this point." The following exchange between defendant and the court then occurred.

"[Defendant] Could I say something your honor? [¶] [The court] No. Let me do the talking. [¶] To start with, your request for an order ordering Mr. Marshall to submit to withdrawal of blood and saliva sample, a fingernail sample and hair sample, the court orders him to do that. You are ordered to give those samples, Mr. Marshall. [¶] [Defendant] Could I say something, your honor? [¶] [The court] Not on that subject. [¶] [Defendant] *I would like to* fire this attorney and *go pro per* because this is not—my right is being violated in this courtroom department P right now." (Italics added.)

After defendant made a rambling statement, the court stated: "Now is the time, Mr. Marshall, to let me know." Defendant replied: "Now you asking me right now to explain to you the circumstances behind all this?" The court responded: "No, I am asking you to tell me why you want me to fire your lawyer and allow you *to go in pro per*." (Italics added.) Defendant then said: "If you give me another lawyer, it still won't do me no good on this capital case because I believe I am being used by this court in order to keep this court open for future. [¶] But let me say this, then I will be finished. *I will take the pro per status*." (Italics added.)

Following some additional remarks by defendant that wandered somewhat from the subject of self-representation, the trial court ruled: "Thank you, Mr. Marshall. [¶] Request to relieve [defense counsel] is denied. *And your request to proceed in pro per is denied*." (Italics added.) The ruling was reflected in the court's written minute order stating, "Defendant's motion to relieve counsel and *proceed in propria persona* are denied." (Italics added.)

From this colloquy, the majority concludes erroneously that defendant was equivocal in his request to proceed without counsel, and that therefore the trial court did not have to honor it.

As set forth above, at the February 23, 1988, hearing, not only did defendant's counsel advise the court of defendant's desire "to go pro per," but defendant himself repeatedly said so. The trial court knew that defendant was asserting his constitutional right to self-representation, for the court

twice at the hearing and later in its formal minute order specifically described defendant's request as one to "proceed in propria persona."

To support its conclusion that defendant's request was equivocal, the majority points to certain rambling statements by defendant at the hearing concerning topics other than self-representation. Those statements did not, however, in any way call into question defendant's unequivocal request for self-representation, as the trial court recognized when it repeatedly described the request as one to "proceed in pro per."

According to the majority, defendant was not "sincere" in asserting his constitutional right to proceed without counsel. (Maj. opn., *ante,* at pp. 26-27.) There is no constitutional requirement, however, that a defendant whose invocation of the right of self-representation is otherwise unequivocal must add the statement, "I really, really mean it," or demonstrate sincerity in some other fashion not identified by the majority.

## C. *Delay and Disruption of Proceedings*

The majority asserts that defendant invoked his constitutional right to self-representation to delay and disrupt the proceedings. (Maj. opn., *ante,* at p. 26.) The majority is wrong.

The record shows that defendant asked to conduct his own defense because his attorney, contrary to defendant's strong opposition, sought a court order to compel defendant to submit to the withdrawal of blood and to provide saliva, fingernail, and hair samples. The wisdom of defendant's action is not at issue here. As I noted earlier, because a defendant wishing self-representation will bear the personal consequences of a conviction, the defendant "must be free personally to decide whether in his particular case counsel is to his advantage." (*Faretta* v. *California, supra,* 422 U.S. at p. 834 [95 S.Ct. at p. 2541]; see also *Thor* v. *Superior Court* (1993) 5 Cal.4th 725, 736 [21 Cal.Rptr.2d 357, 855 P.2d 375] [right to refuse unwanted medical treatment not conditioned on assent of physician or others].)

Nothing in the record indicates that defendant was seeking to delay or disrupt the proceedings when he asked to represent himself. From his arrest on April 13, 1986, until December 19, 1986, defendant was represented by counsel. Defendant conducted his own defense from December 19, 1986, until May 13, 1987, when he was again represented by counsel. The trial court granted three continuances while defendant was acting as his own attorney: one that the court invited defendant to request, when it granted defendant's motion for self-representation; one it had previously told defendant it would grant when an investigator was assigned to assist defendant; and

one defendant requested to seek appellate review of an adverse trial court ruling. On February 23, 1988, when defendant made the request for self-representation at issue here, he did *not* ask for a continuance. Of the 13 continuances cited by the majority (maj. opn., *ante,* at pp. 15-17, ), 10 were secured by counsel.

In its attempt to show that defendant's February 23, 1988, request to proceed without counsel was made to delay or disrupt the proceedings, the majority notes that between December 19, 1986, and May 13, 1987, when defendant was representing himself, he requested advisory or second counsel. Defendant had a right to make such requests. (*Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 430 [180 Cal.Rptr. 489, 640 P.2d 108]; see also *Faretta* v. *California, supra,* 422 U.S. at p. 834, fn. 46 [95 S.Ct. at p. 2541] [standby counsel may be appointed by the court even over the objection of the defendant].) The requests did not cause any delay. Nor were they evidence of "vacillating." (See maj. opn., *ante,* at pp. 22, 27.) A "vacillating" defendant is one who alternates between requests for counsel and requests for self-representation in an attempt to manipulate or abuse the trial process. (*Williams* v. *Bartlett* (2d Cir. 1994) 44 F.3d 95, 101.) To my knowledge, the term has not previously been used to describe a defendant's request for associate or second counsel. Here, defendant represented himself for five months and then had counsel. It was not until 10 months later that defendant again invoked his right to self-representation. This is not vacillation. (*Adams* v. *Carroll, supra,* 875 F.2d at p. 1443 [California criminal conviction vacated for violation of right to personal defense when defendant "first requested counsel, then asked to represent himself when he became dissatisfied with [counsel], then requested counsel again and finally asked to represent himself again when [counsel] was reappointed . . . ."].)

And, contrary to the majority's assertion, the fact that defendant heeded the warnings and advice of the trial judge at his first court appearance by not pursuing a request for self-representation is not evidence of vacillation, delay, or abuse. "The fact that [defendant] tried a lawyer at the urging of the court reflects both sound advice on the court's part and wise deference to that advice on the part of defendant; it does not signify waiver or suggest tactical abuse of the system." (*Williams* v. *Bartlett, supra,* 44 F.3d at p. 101.)

CONCLUSION

Trial judges generally do not look forward to trying a criminal case in which the defendant is conducting his or her own defense. Understandably so. A defendant who is unskilled in the law and courtroom procedures can place a great burden on the trial process, sorely testing the patience of the trial court.

But the right to conduct one's own defense, no matter how unwise for the defendant or burdensome on the trial process, is a personal liberty that is rooted in the dignity of the individual, which is " 'the lifeblood of the law.' " (*Faretta* v. *California, supra,* 422 U.S. at p. 834 [95 S.Ct. at p. 2541], quoting *Illinois* v. *Allen* (1970) 397 U.S. 337, 350-351 [90 S.Ct. 1057, 1064, 25 L.Ed.2d 353] (conc. opn. of Brennan, J.).) The high court found support for this conclusion in "centuries of consistent history," as reflected "in the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged." (*Faretta* v. *California, supra,* 422 U.S. at pp. 832, 818 [95 S.Ct. at pp. 2540, 2532].) The court went on to observe: "The value of state-appointed counsel was not unappreciated by the Founders, yet the notion of compulsory counsel was utterly foreign to them. And whatever else may be said of those who wrote the Bill of Rights, surely there can be no doubt that they understood the inestimable worth of free choice." (*Id.* at pp. 833-834 [95 S.Ct. at p. 2540], fns. omitted.)

The denial of the right of self-representation is federal constitutional error not amenable to "harmless error" analysis. (*McKaskle* v. *Wiggins, supra,* 465 U.S. at p. 177, fn. 8 [104 S.Ct. at p. 950]; *People* v. *Joseph* (1983) 34 Cal.3d 936, 948 [196 Cal.Rptr. 339, 671 P.2d 843].) Because I conclude, for reasons given above, that the trial court in this case should have granted defendant's unequivocal request to act as his own lawyer, I would reverse the judgment in its entirety.

Mosk, J., and Werdegar, J., concurred.

Appellant's petition for a rehearing was denied April 30, 1997. Mosk, J., Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.