Charles O. **REESE**,
Petitioner-Appellant,

v.

**STATE of Iowa, Respondent-Appellee.**

No. 85–720.

Court of Appeals of Iowa

June 4, 1986.

James P. Cleary, Des Moines, for petitioner-appellant.

Thomas J. Miller, Atty. Gen., Ann DiDonato, Asst. Atty. Gen., David E. Richter, County Atty., for respondent-appellee.

Heard by SNELL, P.J., and SCHLEGEL and SACKETT, JJ.

SNELL, Presiding Judge.

Charles Reese was convicted of first-degree murder in 1976. This conviction was reversed in 1977. *State v. Reese*, 259 N.W.2d 771 (Iowa 1977). Upon retrial in 1978, Reese was again convicted of first-degree murder. The second conviction was affirmed on direct appeal. *State v. Reese*, 301 N.W.2d 693 (Iowa 1981). Reese later filed the present postconviction proceeding to challenge the second conviction. The district court denied postconviction relief, and Reese has appealed, asserting his rights to self-representation and confrontation secured by the fourth, sixth, and fourteenth amendments were violated.

Reese contends the court which heard his 1978 retrial denied him his constitutional right to represent himself, and his attorney rendered ineffective assistance by failing to raise this issue on direct appeal.

Reese's remaining issues relate to evidence that shortly after his 1976 arrest he made incriminating statements to a fellow inmate, Teterud. Francis Jared Teterud testified in the 1976 trial, but in Reese's retrial the State received the court's permission to read into evidence Teterud's testimony from the 1976 trial. At that time the State asserted that Teterud could not be located and that he was rumored to be dead. Reese contends that the State did not meet its burden to prove Teterud's unavailability in 1978; he contends that under the circumstances the introduction of a written record of Teterud's prior testimony denied Reese his right to confront Teterud. Once again, Reese also contends that his attorney in the 1981 direct appeal rendered ineffective assistance by failing to raise this issue.

Reese also contends that Teterud's 1976 testimony was the tainted fruit of an arrest made without probable cause. He claims his trial attorneys rendered ineffective assistance by failing to object to the alleged illegality of the arrest.

When a defendant relies on specific omissions to prove ineffective assist-

ance of counsel, two conditions must be demonstrated:

> (1) counsel's performance was so deficient that counsel was not functioning as the "counsel" guaranteed by the sixth amendment, and
>
> (2) the deficient performance so prejudiced the defense as to deprive the defendant of a fair trial.

*State v. Losee,* 354 N.W.2d 239, 243 (Iowa 1984) (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984)).

"The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698 (1984). The defendant must satisfy this burden by a preponderance of the evidence and rebut the presumption of counsel's competence. *Meier v. State,* 337 N.W.2d 204, 206 (Iowa 1983). In deciding whether trial counsel's performance was deficient, we require more than a showing that trial strategy backfired or that another attorney would have prepared and tried the case somewhat differently. *Taylor v. State,* 352 N.W.2d 683, 685 (Iowa 1984). We also will not second guess appellate counsel's decision as to which issues to raise on appeal. *Sims v. State,* 295 N.W.2d 420, 424 (Iowa 1980) (accused is bound by tactical or strategic decisions made by counsel, even those rising to constitutional dimensions).

■ **Self-Representation.** A hearing was held on July 10, 1978, approximately one month prior to trial for the purpose of considering Reese's request for new counsel. At that time, Reese was represented by two court-appointed attorneys, F.J. Kraschel and Troyce Wheeler. During the hearing, Reese expressed his dissatisfaction with F.J. Kraschel. Because Reese felt Kraschel was not devoting enough time to the case and could not be trusted, he requested that the court substitute attorney John W. Logano. Reese had also consulted three or four other attorneys about representing him prior to the hearing. Reese admitted that Kraschel was not incompetent and that he still liked and respected him, but felt that his office was "just too busy." The trial court determined that Reese was not entitled to substitute counsel. The following colloquy ensued:

THE COURT: Well, Mr. Reese, I think we're in a situation here where a few things probably should be understood. First of all, when an attorney is appointed that does not mean that you are entitled to his full services eight to twelve hours a day from the minute he is appointed until trial commences. What you are entitled to and what you constitutionally have a right to is adequate, competent, experienced trial attorney. I don't believe there's any question but what Mr. Kraschel is that in this case.

He knows this case like the back of his hand. As far as him not doing any work on the case, if that is your implication—and I don't think it can be because I don't know how many motions we've had. It must be at least somewhere in the area of 15 to 20 motions that have been passed on formally in open court, and there have been many other informal matters, but—I shouldn't say many other, there's been maybe a few. Most of it has been in open court.

But Mr. Kraschel is one of the most meticulous people I know. He has brought up every point almost to the point of exhaustion in this case. I don't believe he's left a stone unturned. Not only that, in this particular case he obtained a new trial for you on an unprecedented point of law in the State of Iowa. I'm sure you're aware of that. You're here because of Mr. Kraschel's work, as I understand the situation, in appeals court; is that not correct?

THE DEFENDANT: Yes.

THE COURT: And I believe in doing so he made some new law. I don't believe there was ever a new trial granted on this particular point before. I may be

wrong, but it's my understanding that that is the situation.

But he does know this case, and the Court is well aware of his competence. He has represented and been involved in probably more capital offense cases than any other attorney to my knowledge who is currently practicing in Council Bluffs, Iowa.

You are entitled to representation at trial by a good, competent attorney. That is what Mr. Kraschel is. In this particular case you not only have the advantage of Mr. Kraschel, you also have the advantage of Mr. Wheeler who is also an extremely meticulous, competent attorney, and I just don't really honestly know who I could appoint to replace either one of them or both of them who could do a better job for you.

THE DEFENDANT: I have somebody in mind.

THE COURT: You may have, but it's up to the Court to make the appointment, and I believe the law is such that you are entitled to a good, competent attorney and that attorney is not necessarily one of your own choice. And particularly when we get down to shortly before trial when the case is getting fairly well prepared, I think it becomes more discretionary with the Court whether or not the Court will allow you to change counsel.

Now, if you wish to go out and hire counsel, you, of course, are free to do this at any time, but as far as the court-appointed attorney, my only decision, if you want to call it that, is whether or not he's competent and qualified, and he is very competent, and he is very qualified, and so far he has done an enormous amount of time on the case, more than the average attorney would ever do, and has done a good job for you.

And for that reason at this time I'm going to reject your application that you change counsel. In fact, as a matter of fact, even I think if Mr. Kraschel asked to be relieved I would not allow him to do so. That's how strongly I feel that you need his representation in this case.

So Mr. Kraschel—so there's no question about it, Mr. Kraschel and Mr. Wheeler will continue to serve as co-counsel. I'm not designating and have not designated either one the senior counsel since they are both equally qualified and equally competent.

THE DEFENDANT: *Well, I don't want no counsel then.*

THE COURT: Pardon?

THE DEFENDANT: *Well, I don't want no counsel then.*

THE COURT: You're going to have counsel, and these are the two you're going to have. Now, whether you want to consult with them or not, that is up to you. If you choose to sit here and not consult with them, fine, but they are going to be in the courtroom when this case is tried because I'm not going to try the case without adequate counsel present. They are going to be here or in Audubon or wherever the case is tried. So that we understand each other—

THE DEFENDANT: Your Honor, you know, like—

THE COURT: So we understand each other a little further, we are in an area where it's up to the Court to appoint the counsel. It's not up to you to pick and choose what attorneys you have, and these are your attorneys, and these are going to be your attorneys for the completion of this trial which will commence on August 8. There is no way that any other attorney in one or two or three, four months' time could acquire all the knowledge that either Mr. Kraschel or Mr. Wheeler has acquired.

THE DEFENDANT: You know, I realize that, Your Honor.

THE COURT: I'm telling you not only because this is the law. This is my own personal belief that these two men know this case and have lived this case for several years now—for over a year, and I have been through the file. I'm as familiar with the case—probably more familiar than any other judge or anyone else outside of maybe the immediate attorneys involved, and I know what they

have done, and I know what's involved, and you have a complicated case, and they have done a good job on it. I can't fault them for any work they have done.

THE DEFENDANT: I ain't saying they didn't do a good job.

THE COURT: Your complaint then I take it comes down to the fact that they have not been at your beck and call each time you wanted them; is that correct? Do you think—

THE DEFENDANT: That's a pretty cruel way to put it.

THE COURT: Pardon?

THE DEFENDANT: That's not the way that you should put it. That is a pretty cruel—

THE COURT: But that's what it comes down to, isn't it, when we get down to the bottom line?

THE DEFENDANT: The way you want to look at it.

THE COURT: Isn't that about it?

THE DEFENDANT: The way you are looking at it, the way you want to look at it, not the way I'm looking at it, not the way I'm sure they look at it.

THE COURT: That's the way I'm looking at it. They will continue to be your counsel. They are competent. They are qualified. You don't even deny that.

THE DEFENDANT: Of course I can't deny that. I ain't gonna lie.

THE COURT: So they will continue to serve as your counsel.

(emphasis added).

Reese contends that because his assertion of his right to self-representation was clear and unequivocal, he was entitled to proceed pro se at trial. He, therefore, argues that his attorney's failure to raise the denial of his self-representation right on appeal constitutes ineffective assistance of counsel.

In *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the United States Supreme Court established that a criminal accused has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so. However, this right of self-representation may be waived by the accused's failure to assert it.

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For·this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. [citations omitted] Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." [citations omitted]

*Id.* at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581–82. "In the absence of a clear and knowing election, a court should not quickly infer that a defendant unskilled in the law has waived counsel and has opted to conduct his own defense." *Brown v. Wainwright,* 665 F.2d 607, 610 (5th Cir. 1982).

> Furthermore, even if a defendant requests to represent himself, the right may be waived through his subsequent conduct indicating he is vacillating on the issue or has abandoned his request altogether.... Since the right of self-representation is waived more easily than the right to counsel at the outset, *before* assertion, it is reasonable to conclude it is more easily waived after assertion.... A waiver may be found if it reasonably appears to the court that defendant has abandoned his initial request to represent himself.

*Id.* at 611; *see also United States v. Montgomery,* 529 F.2d 1404, 1406 (10th Cir. 1976), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976); *United States v. Conder,* 423 F.2d 904, 908 (6th Cir.1970).

We decline to view Reese's statement regarding self-representation in isolation. The record of the July 10 hearing in its

entirety reflects a desire by Reese to be represented by counsel. The hearing came about because of Reese's motion to change counsel. The hearing was not held to determine whether Reese should be allowed to proceed pro se and his appointed counsel dismissed. The only mention of self-representation occurred in response to the court's denial of Reese's request for substitute counsel of his choice. There is also no indication in the record before or after the hearing that Reese intended or desired to proceed without counsel. His court-appointed attorneys appeared on his behalf at all times, filed numerous pretrial motions, and conducted the defense at trial without protest from Reese.

In this context, we are inclined to view Reese's statement as an expression of frustration at the court's decision, rather than an assertion of his constitutional right. *See Anderson v. State,* 267 Ind. 289, 370 N.E.2d 318, 320–21 (1977), *cert. denied,* 434 U.S. 1079, 98 S.Ct. 1273, 55 L.Ed.2d 786 (1978) (defendant's statement, "I would rather represent myself if I can't get no lawyer," held to be more of a generalized expression of feeling than a clear and unequivocal assertion of his right to proceed pro se). We conclude that Reese's statement did not amount to a clear and unequivocal assertion of the right to proceed pro se. Therefore, Reese's appellate counsel did not perform ineffectively in failing to raise this nonmeritorious issue on appeal.

 **Right to Confrontation.** Reese next asserts that he was denied effective assistance of counsel by his appellate attorney's failure to raise the issue that he was denied his constitutional right to confront a witness against him by the use of Teterud's prior recorded testimony. During Reese's 1978 trial, the State filed an affidavit from a deputy sheriff indicating extensive efforts to locate Teterud and concluding that Teterud was dead. However, no death certificate was produced. Because the trial court determined that Teterud was unavailable, it allowed the certified transcript of Teterud's testimony from Reese's 1976 trial to be read into the record. Teterud's testimony concerned admissions Reese made to him shortly after the murder while both men were held in jail in Omaha.

Pottawattamie County Attorney David Richter made a professional statement on the record during the postconviction proceeding that in November of 1984 he received a telephone call from a person identifying himself as Black Cloud. Richter knew that Teterud went by the name of Black Cloud; however, he did not recognize the voice. Black Cloud claimed he was in Colorado and requested a birth certificate. Richter informed Black Cloud that he would have to write for the birth certificate. No such correspondence was ever received from Black Cloud.

Based on this information, Reese contends that the State failed to prove that Teterud was unavailable in 1978.

The sixth amendment, made applicable to the states by the fourteenth amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI. The primary interest thus secured is the right of cross-examination. *State v. Dean,* 332 N.W.2d 336, 338 (Iowa 1983). An exception is made to this right where a witness is unavailable. *Id.* "When the State seeks to introduce prior testimony of an unavailable witness, it must show that the witness is in fact unavailable, despite a good faith effort to produce the witness at trial." *State v. Zaehringer,* 325 N.W.2d 754, 758–59 (Iowa 1982) (citing *Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597, 613 (1980); *Barber v. Page,* 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255, 260 (1968)). The prosecution bears the burden of establishing the good faith effort. *Dean,* 332 N.W.2d at 338; *Zaehringer,* 325 N.W.2d at 759. A good faith effort requires more than the issuance of a subpoena and the return of it stating the witness was not found. *Dean,* 332 N.W.2d at 339.

Here, the State introduced an affidavit from Deputy Sheriff James Babbett stating the deputy engaged the assistance of the

Iowa Bureau of Criminal Investigation, the Federal Bureau of Investigation, the Bureau of Indian Affairs in Washington, D.C., the National Crime Information Center, Washington Bureau of Indian Affairs, the Washington Crime Information Center, the King County, Washington Sheriff's Office, and the Omaha, Nebraska Police Department.

At some point the deputy received information that Teterud had died in the State of Washington, but was unable to confirm this death or locate him elsewhere. The deputy clearly launched timely inquiries out-of-state in an attempt to determine Teterud's whereabouts. He and other law enforcement agencies followed up on leads they received, but Teterud could not be found.

We conclude that the State met its burden of establishing a good faith effort to produce Teterud at trial and his unavailability. Therefore, his prior recorded testimony was admissible at trial and appellate counsel's failure to challenge its admissibility did not constitute ineffective assistance.

Furthermore, the information from Attorney Richter concerning his telephone conversation with someone claiming to be Black Cloud is not newly-discovered evidence within the meaning of Iowa Code section 663A.2(4) (1985). Reese has presented no evidence that this information would probably change the result of his trial.

■ **Illegal Arrest.** Reese also argues that his trial counsel provided ineffective assistance by failing to object to the illegal arrest of Reese and the admissibility of Teterud's testimony regarding admissions made by Reese. Reese contends that his arrest was illegal because a motion to suppress physical evidence due to a defective search warrant was granted. Therefore, Reese urges his admissions to Teterud should also have been suppressed as "fruit of the poisonous tree."

The exclusionary rule bars the use of both evidence directly seized in an unlawful entry and illegal arrest and evidence dis-covered indirectly through the use of evidence or information gained in the unlawful entry or an illegal arrest. *State v. Hatter*, 342 N.W.2d 851, 856 (Iowa 1983). Evidence obtained as a result of such an arrest must therefore be suppressed unless intervening events break the causal connection between the unlawful entry and the discovery of such evidence. *Id.*

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (citations omitted)

*Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963). Moreover, if the later statement results from "an intervening independent act of a free will" the evidence is purged of its taint. *Id.* at 486, 83 S.Ct. at 416–17, 9 L.Ed.2d at 454.

In this case we find that Reese has failed to present evidence to establish that his arrest was illegal. Solely because search warrants were invalidated in this case does not mean that probable cause did not exist to support Reese's arrest. There is nothing else in the record to support Reese's argument that there was no probable cause for his arrest.

■ Furthermore, even if the arrest was illegal, the statements Reese made to Teterud occurred nine days after Reese's arrest and were voluntary. Reese's statements to Teterud were not the result of oppressive circumstances or police exploitation of his arrest. Rather, they resulted from a clear act of Reese's free will and involved no police conduct at all. We conclude that these statements were sufficiently attenuated from Reese's arrest and do not constitute tainted fruit of the poisonous tree. Therefore, Reese's trial counsel correctly concluded that Teterud's testimo-

ny was admissible and not vulnerable to a motion to suppress. No ineffective assistance claim is supportable in this regard.

AFFIRMED.