# IN THE COURT OF APPEALS OF IOWA

No. 19-1324
Filed February 3, 2021

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**RONALD DEAN SHARE,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Buchanan County, Linda Fangman (arraignment and April 2 pretrial) and George L. Stigler (April 17 pretrial and trial), Judges.

Ronald Share appeals his convictions for first-degree kidnapping, attempt to commit murder, willful injury resulting in serious injury, and eluding. **AFFIRMED.**

Christopher Kragnes, Sr., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Benjamin Parrott, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

On direct appeal from four criminal convictions, Ronald Share alleges the district court denied him his constitutional right to represent himself at trial and denied him his right to counsel. He also challenges the sufficiency of the evidence supporting his convictions.

### I. Background Facts and Proceedings.

In April 2018, a woman called law enforcement to report she was in a vehicle driven by Share, who was threatening to kill them both by crashing the vehicle at a high rate of speed. Share struck the woman and would not allow her to exit the vehicle. An officer located Share's vehicle and tried to make contact, but Share drove away. The officer followed in a marked police vehicle with the siren and emergency lights activated as Share reached speeds over one-hundred-ten miles per hour on the interstate highway. The pursuit ended in a horrific crash—all caught on dash cam video. Share drove into the median headed straight toward a bridge support. He smashed into the support's protective guardrail doing eighty-seven miles per hour. The woman passenger sustained life-threatening injuries, including a head injury, multiple fractured bones, and lacerations to her liver, kidney, spleen, and intestines.

In November 2018, the State charged Share with first-degree kidnapping, attempt to commit murder, willful injury resulting in serious injury, and eluding.[1] The district court appointed counsel to represent Share.[2] At his arraignment,

---

[1] The State also charged Share with operating while intoxicated, first offense, but it later dismissed the charge.

[2] The first attorney appointed to represent Share withdrew due to a conflict of interest. A second attorney withdrew from representation based on lack of staff.

Share repeatedly interrupted the proceedings. After the trial information was read, Share's attorney confirmed to the court that Share was demanding his right a speedy trial. He then asked Share, "Do you want to demand, or do you want to waive and give us a little more time?" Share said "No. I want to demand. I—Your Honor, do I get my say?" The court responded, "No. This is an arraignment and an arraignment only." Share then told the court, "Okay. I want to represent myself. I do not want this guy[3] as my attorney. I want to represent myself and a jury trial." The court informed Share that he could "file the appropriate paperwork for that." The arraignment concluded at 12:43 p.m. Eleven minutes later, Share filed a $50 million lawsuit against the State "due to the court misconduct" in all his pending criminal cases. Later that afternoon, Share filed a written motion asking the court to dismiss his counsel because he did not feel they had his best interest in mind. He also asked the court to let him represent himself.

Concerned about Share's cognitive limitations and apparent paranoia due to mental-health concerns, the next day Share's attorneys filed an application for competency evaluation to determine whether Share was competent to stand trial and assist in his own defense. About twenty minutes later the court denied Share's motion to dismiss his counsel, noting Share filed it the same day he met the attorney. The order did not mention Share's request to represent himself.

The following day, the State motioned to suspend the proceedings pending Share's competency evaluation. The court ordered the competency evaluation

---

The court appointed a third attorney to represent Share before allowing that attorney to withdraw. Finally, the two attorneys who represented Share at trial entered their appearances.

[3] Only one of the two attorneys representing Share was present at the arraignment.

and stayed the proceedings pending the evaluation and competency determination. Share sent various pro se communications to the court during the suspension period.

The court held a hearing on February 26, 2019, after receiving the report from the competency evaluation, which concluded Share was competent to stand trial. When asked if he had a chance to discuss the report with Share, one of Share's attorneys said, "We've discussed it. He hasn't had a chance to read through it all completely yet. . . . [W]e discussed this briefly. We didn't go into any great detail." Share's attorney also informed the court that Share had a copy of the report. Share's attorney expressed some concern that Share identified the wrong person as his attorney and asked the court to have Share evaluated by an independent expert of their choosing. The court determined Share was competent to stand trial but authorized the evaluation by an independent expert and directed the defense to file a motion if that report raised any concerns about Share's competence. Trial was set for April 24, with a pretrial set for April 2.

Share filed pro se motion to appoint new counsel on March 22, 2019, stating he did not believe his attorneys had his best interest in mind or the time to focus on his case. In a statement attached to the motion, Share wrote:

> I do not trust them and I am very concerned with things they have done and said to me. On 12-18-2018 I have my first hearing in Buchanan County and Thomas Goodman shown up an said didn't have time to talk had to go to the court room. So now I'm walking in to court not knowing what is going on. I told the Judge then I did not trust him and I put a motion in for new council but was denied. I had gone 40 days with no lawyer for any Buchanan case. The second time I met with one of the lawyers was 71 days later and it was Les Blair at my 2-26-2019 competency hearing and Les gave me a copy of the results walking in to court. Now I'm walking in to court again blind not knowing the results of the competency evaluation. Then

Les lied to me and asked the Judge for another competency hearing with Dr. Art Konar of Ames. That was also the day that Les gave me half of the minutes of testimony that was filed on November 26, 2018 and it now February 26 2019 76 days later and then on 3-11-19 I got another 40 pages of minutes of testimony. I'm thinking the wrong person went to the competency hearing. I think that the minutes of testimony should be enough to show Tom and Les are not doing their job adequately and I have many more concerns about their intentions. The came and seen on 3-21-19 and did not show me the results of Dr. Konar's evaluation and I think that is something I have a right to see. I have shown both lawyers the major corruption that I have found in my court papers and they just act like its no big deal. Well I bet a jury will think like me. That is a very big deal. I do not feel comfortable having these lawyers representing me on these charges. I am asking the court to appoint new council.

The court addressed Share's motion at the April 2 pretrial conference. At the conference, one of Share's attorneys stated his belief that Share did not trust him or his co-counsel, made threats of forcible felonies against his co-counsel, and had been "combative" in most of their conversations. The court asked Share, "Are you ready to go with these attorneys in two weeks?" and Share answered, "No." When asked why he was not ready to proceed with his counsel, Share stated:

> Well, I had—I had another attorney that was helping me that was appointed to me two weeks after these two were appointed to me, and here's (indicating) his file. And what these two have done for me in—since December 13th, I have six pages that they have sent me; six single pages that they have sent me. They didn't get me my Minutes of Testimony. It was filed November 26th, and I didn't get the Minutes of Testimony. I only got half of it 71 days later. Okay.
> THE COURT: But as we sit here today, you filed a motion to have new attorney.
> THE DEFENDANT: Yes.
> THE COURT: Why?
> THE DEFENDANT: They don't do anything. It doesn't matter what—it doesn't matter what I say to them.

Share then went off on a lengthy diatribe regarding matters unrelated to the issue of his counsel's representation before the court directed him back to the issue at hand, asking, "Why do you need new counsel?" Share responded:

The trust issue broke down from the very beginning because when they first—when they first come and seen me, which was a long time ago, they sent their investigator . . . to see me. And they didn't come and see me; they sent the investigator.

And so what he wanted out of me—he wanted me to tell them where the State's witness was, and I don't know where the State's witness was. But why would I want to give up the State's witness to come and testify against me? I mean, I don't know how stupid they think I am. But why would I want—why would I want to give the State's witness—if I knew where she was, why would I want to tell them so that they could bring her in to testify against me in court? So there's the big flag right there that told me that they're not really looking out for me or have my best interest. Okay.

THE COURT: Well, I'm just going to suppose, but I'm assuming they actually wanted to know so they could talk to her to find out if she was actually going to say the things the State says she's going to say or if she was going to say something more favorable to you, and—

THE DEFENDANT: Well, you know, it doesn't—if you're not going to listen to what I'm going to say—

THE COURT: Just a minute.

—and they didn't want Mr. Harden [the County attorney] to be part of that conversation. That's pretty standard, actually.

Share again digressed into unrelated issues before stating he did not trust his counsel.

THE DEFENDANT: I do not trust these people. Anything I bring up to them, they don't want to take that—they don't want to go to court that way. They want to go to court, and they want me—anything that has to do with incriminating myself, that's all they want to hear. And that's all that any attorney has wanted to hear that I've had so far.

THE COURT: So it sounds—

THE DEFENDANT: I got—I got a long list of things that's been going on.

THE COURT: Well, Mr. Share, would you agree with me that you've had a problem with most of the attorneys appointed?

THE DEFENDANT: I've had—well, the one attorney got caught lying in court, committed perjury in court. Would you want that attorney working for you?

THE COURT: So if I gave you new counsel, what makes you believe that you will work better with new counsel than these two?

THE DEFENDANT: These two absolutely does not matter what I say or what I come up with, they do not want to hear it. They only want to talk about what incriminates me.

THE COURT: Do you—

THE DEFENDANT: And I do not trust them at all.

The court asked Share if he wanted a speedy trial.

THE DEFENDANT: Yeah, I want my speedy trial, but I don't want it with these guys.

THE COURT: Okay. Speedy trial—we're going to go to trial then on April 24th. That is 22 days away. There is—

THE DEFENDANT: I don't want these guys for my lawyer.

THE COURT: There is no way a new attorney is going to be ready to go in 22 days.

THE DEFENDANT: All right. We'll waive my speedy trial. I do not want these guys for my attorney.

THE COURT: We're going to go off the record.

THE DEFENDANT: No. I don't want to go off the record. I've already had problems going off the record.

THE COURT: We're going to go off the record for you to review the speedy trial waiver, and then we will come back on the record. I'm not going to read a form out loud to you. I know you can he read.

THE DEFENDANT: You're putting me under dire—you're putting me under duress. You're telling me I have to go to court with these two guys that—

THE COURT: All right. We're not going to have him waive.

THE DEFENDANT: I don't trust these lawyers and—

THE COURT: Brenda, you report me.

Mr. Share, we are no longer reporting you. Mr. Share does not want to waive speedy trial. I am not forcing him to waive speedy trial. He has a trial date of April 24th that complies with that.

THE DEFENDANT: I don't want these guys.

THE COURT: I know—

THE DEFENDANT: I'll sign the speedy trial.

THE COURT: —that Mr. Goodman and Mr. Blair are capable of being prepared for trial, and that will be my order.

THE DEFENDANT: I don't want them.

THE COURT: Trial will proceed on April 24th. The State needs to proceed and know that that will be a priority.

The court denied Share's motion for new counsel. No written order was generated by this pretrial.

The court held another pretrial hearing on April 17 to determine whether Share would agree to waive his right to a speedy trial. At the hearing, the issue of

Share's dissatisfaction with counsel arose again. The court noted that trial was scheduled to begin in seven days, which was insufficient time for new counsel to prepare. The court also opined, "I am not at all satisfied that if we gave you a different attorney that you wouldn't have the same problem with them or the new attorney that you had with [prior counsel]." At one point Share interjected with profanity. The court ordered Share be taken back to jail. Share retorted, "Fuck you guys." After the court concluded it was "clear" that Share would not waive his right to a speedy trial, the attorneys discussed the arrangements needed for trial to begin on April 24.

Trial began on April 24 as scheduled, and the jury returned a verdict finding Share guilty on all four counts.

**II. Constitutional Violations.**

On appeal, Share first contends the district court violated his constitutional right to represent himself and his right to counsel. We review these claims de novo. *See State v. Martin*, 608 N.W.2d 445, 449 (Iowa 2000).

The United States Constitution guarantees a defendant the right to counsel. *See* U.S. Const. amend. VI; *State v. Rater*, 568 N.W.2d 655, 657-58 (Iowa 1997). This right remains in effect until waived. *See Rater*, 568 N.W.2d at 658. The right to counsel includes the right to self-representation. *Id.* Unlike the right to counsel, the right to self-representation is not effective until a defendant asserts it. *See id.* Before the right to self-representation attaches, a defendant must knowingly and intelligently waive the right to counsel after the court informs the defendant of the dangers and disadvantages of self-representation. *See id.*

### A. Right to self-representation.

Share claims the court violated his right to self-representation by failing to conduct a *Faretta*[4] colloquy to determine whether he was knowingly and voluntarily waiving his right to counsel after he stated his desire to represent himself during the arraignment. But a defendant's request to proceed without counsel must be clear and unequivocal. *See id.* Share vehemently argues that he did clearly and unequivocally request that he represent himself. He points to a singular statement made at the arraignment: "I want to represent myself." Taken in isolation, the statement would seem to trigger the *Faretta* colloquy requirement. But looking at the larger picture, we conclude Share's request to represent himself is not so clear.

Share stated he wanted to represent himself because he did not want his appointed attorneys to represent him. In reviewing the arraignment proceedings leading up to that point, we find it understandable that the district court may have taken the statement like a retort by an impetuous child rather than a clear and unequivocal request. *See, e.g.*, *Reese v. State*, 391 N.W.2d 719, 724 (Iowa Ct. App. 1986) (holding defendant did not unequivocally request right to self-representation where request was made in isolation after the trial court denied his request for substitute counsel); *Reese v. Nix*, 942 F.2d 1276, 1281 (8th Cir. 1991) (finding a reasonable person could have concluded the defendant was merely expressing his frustration rather than clearly invoking his right to self-

---

[4] *Faretta v. California*, 422 U.S. 806, 835 (1975). "In order for the defendant to properly waive his right to counsel we have required courts 'to engage the accused in a colloquy sufficient to appraise a defendant of the dangers and disadvantages inherent in self-representation.'" *Hannan v. State*, 732 N.W.2d 45, 53 (Iowa 2007) (citation omitted).

representation by stating "I don't want no counsel then" after the trial court denied his motion for substitute counsel); *United States v. Seugasala*, 702 F. App'x 572, 574 (9th Cir. 2017) ("Seugasala's comments to the effect that he would rather represent himself—made at the end of a lengthy hearing about his request for substitute counsel—were equivocal when viewed in context."); *Burton v. Collins*, 937 F.2d 131, 133-34 (5th Cir. 1991) (holding defendant's statements were correctly interpreted as "indicat[ing] dissatisfaction with his attorney" rather than as unequivocally asserting his right to self-representation), *cert. denied*, 502 U.S. 1006 (1991); *Tate v. State*, 346 So. 2d 515, 521 (Ala. Crim. App. 1977) ("It affirmatively appears from this colloquy that the appellant did not want to represent himself but was dissatisfied with the performance of his court appointed attorney."). There was no misstep on the part of the district court in failing to interrupt the arraignment to conduct an on-the-spot *Faretta* colloquy.

The court told Share to put it in writing, and the arraignment ended shortly thereafter. Share did put his request to represent himself in writing later that day. By the time the court ruled on Share's written motion, his attorneys had applied for a competency evaluation. Certainly, if Share was not competent to stand trial, he would not be competent to represent himself. In any event, the order denying Share's motion addresses the motion as one to dismiss counsel and notes Share's motion was filed the same day he met counsel. Although the order obviously denied Share's request to represent himself, the order does not specifically address the issue. The next day the State motioned to suspend the proceedings. The following day the court stayed the proceedings pending results of the competency evaluation.

After it was determined Share was competent to stand trial, the court lifted the stay and set the matter for trial and scheduled a pretrial conference. Share did not file a Rule 1.904(3) motion to reconsider, enlarge, or amend the court's denial of his written motion to dismiss counsel. He did file a pro se motion for new counsel stating, "I believe new council will be in the best interest of all concerned." Attached was a two-page statement outlining his grievances with his attorneys. His motion was considered at the April 2 pretrial conference. When faced with the reality that there was "no way" a new attorney could be ready for trial in twenty-two days, Share contemplated waiving his right to speedy trial, although he felt "under duress" in doing so. Share was quite vocal at the conference but not once did he request that he represent himself. Share again expressed his dissatisfaction with his attorneys at the April 17 pretrial but did not request that he represent himself.

Share argues that "[w]hen the district court found that Share was competent to stand trial, the court should have engaged Share in a colloquy addressing his requests to represent himself." But after Share was found competent to stand trial, he motioned for new counsel. The court had no duty to conduct a *Faretta* colloquy after that motion was filed even if Share's earlier request to represent himself could be considered clear and unequivocal. In view of all the circumstances, we conclude Share's right to represent himself was not violated by the district court.

**B. Right to counsel.**

Share then claims the court violated his right to counsel by denying his request for substitute counsel. We begin by noting that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). Rather, the

constitution only guarantees a criminal defendant a right to effective counsel. *See State v. Smith*, 761 N.W.2d 63, 69 (Iowa 2009). To replace court-appointed counsel, a defendant must show sufficient cause. *See State v. Petty*, 925 N.W.2d 190, 196 (Iowa 2019). "A complete breakdown in communication between an attorney and a defendant is sufficient cause justifying the appointment of substitute counsel." *Id.* (citation omitted). Although the court has a "duty of inquiry" when a defendant requests substitute counsel based on an allegation of breakdown in communication, the court has considerable discretion in deciding whether to grant substitute counsel. *State v. Mott*, 759 N.W.2d 140, 149 (Iowa Ct. App. 2008).

Share argues the court abused its discretion in denying his request for substitute counsel, citing his counsel's agreement that there was "an absolute breakdown in the attorney/client relationship." "[T]o prove a total breakdown in communication, a defendant must put forth evidence of a severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible." *State v. Tejeda*, 677 N.W.2d 744, 752 (Iowa 2004) (citation omitted).

> [G]eneral frustration and dissatisfaction with defense counsel expressed by a defendant does not alone render counsel unable to perform as a zealous and effective advocate. The focus of the inquiry is not on the defendant's relationship with his or her attorney, but the adequacy of counsel in the adversarial process. In reality, a person accused of a crime is often genuinely unhappy with an appointed counsel who is nevertheless doing a good job. Thus, not all criticism lodged by a defendant against defense counsel requires new counsel.

*State v. Boggs*, 741 N.W.2d 492, 506 (Iowa 2007) (cleaned up). Despite counsel's agreement regarding a breakdown in their relationship, the issue appears to have been one way. The record shows Share was a difficult client, and his counsel was

concerned about threats Share made. Although Share's obstinacy may have impeded their ability to provide a better defense, counsel never claimed they were unable to provide effective representation.

Still, the court may have granted Share's request but for one complicating factor—Share's demand for a speedy trial and the proximity to the trial date. Share was deemed competent to stand trial at the February 26 hearing, the stay of the proceedings was lifted, and trial set for April 24 to meet the speedy trial deadline. Share filed his motion for substitute counsel about a month later—one month before the trial was scheduled to begin. The court heard argument on the motion at the April 2 pretrial conference, some twenty-two days before trial. The court determined there was insufficient time for substitute counsel to be ready for trial. Share was confronted with a decision: waive his right to a speedy trial or proceed to trial as scheduled with his appointed counsel. Share did not wish to waive his right to a speedy trial. The matter of a waiver of speedy-trial rights was again addressed on April 17, one week before the start of trial. Share never waived his right.

Share complains on appeal that the court misstated the record in finding he refused to waive his right to a speedy trial. We disagree. At the April 2 pretrial conference, Share stated, "Yeah, I want my speedy trial" and "Yeah, I want my speedy trial, but I don't want it with these guys." After being told "[t]here is no way a new attorney is going to be ready to go in 22 days," Share then agreed to waive his right to a speedy trial. But in doing so, Share complained the court was "putting [him] under duress." Despite his proffered agreement to waive his speedy trial rights, the record is clear that any offer to waive that right was not voluntary.

We also note that Share's conflict with counsel is not limited to the two attorneys who represented him at trial. At the April 17 pretrial conference, Share's counsel informed the court that Share intended to claim they committed ethical violations and "he's had this same type of situation with previous counsel in the past which I think is why we were—told him we had to stay in the case." The court commented that one week was not enough time for new counsel to prepare for trial and that it was "not at all satisfied that if we gave you a different attorney that you wouldn't have the same problem with them or the new attorney that you had with [prior counsel]." The court also opined that Share would not be happy with anyone because he seemed "to be an individual who wants whatever he wants and [who] . . . isn't going to listen to anyone."

The court asked Share's counsel if they would be ready for trial in one week. Counsel explained that although they were prepared to go to trial, they had asked Share to waive his right to speedy trial to allow them more time to explore potential defenses and Share refused. The court concluded, "It's clear he's not going to waive anything. He's not going to be cooperative. So we're going to have to try the case next Wednesday."

The court was caught between a rock and a hard place because Share never voluntarily waived his right to counsel or his right to a speedy trial. The court reasonably deduced that new counsel could not prepare for trial in the limited window of time left. In contrast, Share's appointed counsel were prepared to proceed with the scheduled trial. There is no question that Share disliked and distrusted his attorneys, but the fraught nature of their relationship did not render counsel incapable of representing Share effectively. Nor has Share demonstrated

any conflict of interest. On the record before us, we find no abuse of discretion in denying Share's request for substitute counsel.

## III. Sufficiency of the Evidence.

Share also contends there is insufficient evidence to support his convictions for kidnapping, attempted murder, and willful injury. We review these claims for correction of legal error to determine whether substantial evidence, that which would convince a rational factfinder of Share's guilt beyond a reasonable doubt, supports the convictions. *See State v. Folkers*, 941 N.W.2d 337, 338 (Iowa 2020). In doing so, we view the evidence in the light most favorable to the verdict, "including all legitimate inferences and presumptions that may fairly and reasonably be deduced from the evidence in the record." *Id.*

### A. Kidnapping.

In order to find Share guilty of first-degree kidnapping, the court instructed the jury that the State had to prove that Share confined or removed a person from one location to another with the specific intent to inflict serious injury and did so with the knowledge that he did not have the person's consent. Regarding confinement, the court instructed the jury:

> A person is "confined" when her freedom to move about is substantially restricted by force, threat or deception. The person may be confined either in the place where the restriction began or in a place to which she has been removed.
> No minimum time of confinement or distance of removal is required. It must be more than slight. The confinement or removal must have significance apart from the Attempt to Commit Murder or Willful Injury.
> In determining whether confinement or removal exists, you may consider whether:
> 1. The risk of harm to [the person] was substantially increased.
> 2. The risk of detection was significantly reduced.

16

3. Escape was made significantly easier.

Share agues there is insufficient evidence to show the confinement was significant beyond what was required to commit the underlying offenses.

When viewed in the light most favorable to the State, there is ample evidence in the record to satisfy the element of confinement. Although Share claims there is undisputed evidence that his passenger entered his vehicle willingly, she did not choose to remain in the vehicle. The passenger later called 911 to report that Share refused to let her out of the vehicle and was threatening to kill her. After she made the call, an officer located the vehicle parked in a different location than the call was made and witnessed Share assaulting the passenger in the backseat. Share then sped away and was pursued for a time before driving into the bridge support. Because a reasonable jury could conclude Share confined his passenger as required to commit kidnapping, we affirm his kidnapping conviction.

**B. Attempted murder and willful injury.**

Share also contends there is insufficient evidence to support his convictions for attempted murder and willful injury because the State cannot show he intended to drive into the bridge support. But during the 911 call, the passenger reported Share's statement that he intended to kill her by driving the vehicle at a high rate of speed into a structure. Share proceeded to do just that. An officer was in pursuit of Share when he drove into the bridge support, and the jury viewed the officer's dashcam video. Given the speed at which Share's vehicle was traveling at the time it left the road and the lack of any evasive action on Share's part, there is

substantial evidence to support Share's attempted-murder and willful-injury convictions.

**AFFIRMED.**